**2023 IL 129248**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 129248)

JAMES R. ROWE, Kankakee County State's Attorney, *et al.*, Appellees, v. KWAME RAOUL, Attorney General of Illinois, *et al*, Appellants.

*Opinion filed July 18, 2023.*

CHIEF JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Neville, Cunningham, and Rochford concurred in the judgment and opinion.

Justice O'Brien specially concurred, with opinion.

Justice Overstreet dissented, with opinion, joined by Justice Holder White.

**OPINION**

¶ 1        This appeal concerns the constitutionality of Public Acts 101-652 and 102-1104 (eff. Jan. 1, 2023), which dramatically changed the statutory framework for pretrial

release of criminal defendants in Illinois. The circuit court of Kankakee County held that certain provisions of those acts violated the bail clause (Ill. Const. 1970, art. I, § 9), the crime victims' rights clause (*id.* § 8.1(a)(9)), and the separation of powers clause (*id.* art. II, § 1) of the Illinois Constitution of 1970. For the reasons that follow, we reverse that decision.

¶ 2                                          BACKGROUND

¶ 3        In 2017, this court established the Illinois Supreme Court Commission on Pretrial Practices (Commission) and charged it with "conducting a comprehensive review of the State's pretrial detention system" and with making recommendations on potential reforms to that system. Ill. S. Ct. Comm'n on Pretrial Practices, Preliminary Report 4 (2018), https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/3c2435c7-c00a-4a7e-bebb-141afa154102/12-18.pdf [https://perma.cc/S8VA-83S9]. In 2020, the Commission issued its final report, listing more than 50 recommendations to reform pretrial practices to "ensure defendants are not denied liberty solely due to their inability to financially secure their release from custody." Ill. S. Ct. Comm'n on Pretrial Practices, Final Report 22 (2020), https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/227a0374-1909-4a7b-83e3-c63cdf61476e/Illinois%20Supreme%20Court%20Commission%20on%20Pretrial%20Practices%20Final%20Report%20-%20April%202020.pdf [https://perma.cc/Y4FU-GJKL]. The Commission observed that the General Assembly bore responsibility to amend the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/100-1 *et seq.* (West 2020)) in that regard, and it urged the legislature to ensure that "conditions of release will be non-monetary, least restrictive, and considerate of the financial ability of the accused." Ill. S. Ct. Comm'n on Pretrial Practices, Final Report 69 (2020).

¶ 4        The following year, such reform occurred. In 2021, the General Assembly passed, and the Governor signed, Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act (Act).[1] The Act comprehensively overhauled many aspects of the state's criminal justice system. The Act revised the standards for police officers' use of force in

_____
[1]The Act has also sometimes been referred to in the press as the Pretrial Fairness Act. Neither name is official, as neither appears in the Illinois Compiled Statutes or public act.

making arrests (*id.* § 10-216), conferred new authority on the Attorney General to investigate and combat alleged civil rights violations by law enforcement agencies (*id.* § 10-116.7), and imposed new requirements for correctional facilities, including the requirement that those institutions report all deaths in custody (Pub. Act 101-652, § 3-1 (eff. July 1, 2021)). Most importantly and relevant to this appeal, the Act, along with Public Act 102-1104 (eff. Jan. 1, 2023) (Follow-Up Act), dismantled and rebuilt Illinois's statutory framework for the pretrial release of criminal defendants. See Pub. Act 101-652, § 10-255, 102-1104, § 70 (eff. Jan. 1, 2023) (amending 725 ILCS 5/art. 110).

¶ 5        The Act's pretrial release provisions center on the abolition of monetary bail. See Pub. Act 101-652, § 10-255 (eff. Jan. 1, 2023) (adding 725 ILCS 5/110-1.5) ("the requirement of posting monetary bail is abolished"). Instead of monetary bail, the Act's pretrial release provisions, as amended by the Follow-Up Act, establish a default rule that all persons charged with an offense shall be eligible for pretrial release on personal recognizance (Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending 725 ILCS 5/110-2(a))), subject to conditions of release that the trial court deems appropriate, such as electronic monitoring or home supervision (*id.* (adding 725 ILCS 5/110-5(c), 110-10)). Although the Act eliminates monetary bail and provides that "[a]ll persons charged with an offense shall be eligible for pretrial release before conviction" (*id.* (amending 725 § 110-2(a))), the pretrial release provisions allow the State to seek, and the trial court to order, pretrial detention of criminal defendants in certain specified cases. See *id.* (amending 725 ILCS 5/110-2, 110-6.1). The court may order a defendant detained pending trial if the defendant is charged with any of an array of enumerated felony offenses and "poses a real and present threat to the safety of any person or persons or the community." *Id.* (amending 725 ILCS 5/110-6.1(a)(1)-(7)). The court may also order a defendant detained pending trial, if the defendant has been charged with an enumerated offense or any felony "other than a Class 4 offense" and if the court concludes there is "a high likelihood of willful flight to avoid prosecution." *Id.* (adding 725 ILCS 5/110-6.1(a)(8)). Under this new statutory scheme, "[a]ll defendants shall be presumed eligible for pretrial release," and the State bears the burden of establishing a defendant's eligibility for pretrial detention. *Id.* (amending 725 ILCS 5/110-6.1(e)).

¶ 6        The Act also revised section 110-5 of the Code by removing all references to the term "bail" and all references to the trial court's discretion in the determination of "the amount of monetary bail." See Pub. Act 101-652, § 10-255 (eff. Jan. 1, 2023) (amending 725 ILCS 5/110-5). The Act replaced the provisions addressing the determination of "the amount of monetary bail" with provisions that set out factors the court must consider in determining the conditions of pretrial release. *Id.* The Act also repealed section 110-7 of the Code, which provided for the deposit of 10% of any required monetary bail. *Id.* § 10-260 (repealing 725 ILCS 5/110-7). The Act's pretrial release provisions were scheduled to take effect on January 1, 2023.

¶ 7        On September 16, 2022, plaintiffs James Rowe, the State's Attorney of Kankakee County, and Michael Downey, the Sheriff of Kankakee County, filed a lawsuit in the Kankakee County circuit court against Illinois Attorney General Kwame Raoul, Illinois Governor Jay Robert Pritzker, Illinois House Speaker Emanuel Christopher Welch, and Illinois Senate President Donald Harmon. The plaintiffs raised claims that challenged the constitutionality of the Act as a whole and, alternatively, claims that challenged only the constitutionality of the pretrial release provisions.

¶ 8        The plaintiffs' first amended complaint contained eight counts. Count I alleged that the Act's pretrial release provisions are, in effect, an invalid attempt by the legislature to amend the Illinois Constitution. See Ill. Const. 1970, art. XIV. Count II alleged that the Act is unconstitutional in its entirety due to the legislature's alleged failure to comply with the Illinois Constitution's single subject rule. See *id.* art. IV, § 8(d). Count III alleged that the pretrial release provisions violate the bail clause of the Illinois Constitution. *Id.* art. I, § 9. Count IV alleged that the pretrial release provisions violate the crime victims' rights clause. *Id.* § 8.1(a)(9). Count V alleged that the pretrial release provisions violate the separation of powers clause. *Id.* art. II, § 1. Count VI alleged that the Act in its entirety violates the three-readings requirement. See *id.* art. IV, § 8(d). Count VII alleged that the various provisions of the Act violate due process due to vagueness. And, finally, Count VIII requested injunctive relief.

¶ 9        Subsequently, additional state's attorneys and sheriffs filed lawsuits in other counties throughout the state, all of which raised essentially the same constitutional challenges. On October 31, 2022, this court transferred and consolidated those

lawsuits with the initial lawsuit in Kankakee County. See Ill. S. Ct. R. 384 (eff. July 1, 2017). Several other similar lawsuits were later consolidated with the Kankakee County lawsuit by agreement of the parties.

¶ 10    In November 2022, the parties filed cross-motions for summary judgment. After the motions were filed, the General Assembly passed, and the Governor signed, Public Act 102-1104 (eff. Jan. 1, 2023), which amended various provisions of the Act. The trial court ordered supplemental briefing on the effect of the Follow-Up Act's amendments. On December 28, 2022, the trial court issued a 33-page memorandum of decision, granting the plaintiffs' motion for summary judgment.

¶ 11    The trial court rejected the plaintiffs' arguments in counts II and VI that the Act violated the single-subject rule and the three-readings requirement in article IV, section 8(d), of the Illinois Constitution of 1970. Before addressing the merits of the plaintiffs' other constitutional claims, the trial court discussed the plaintiffs' standing. According to the trial court, "[p]laintiffs, elected State's Attorneys and Sheriffs, are in a unique position as representatives of not only their offices but the citizens of their respective counties," and "they are uniquely qualified to challenge unconstitutional legislation in a way the average citizen cannot." The court referred to the state's attorneys' oath to uphold the constitution, adding that, if these plaintiffs lack standing, "it becomes difficult to imagine a plaintiff who would have standing to bring a declaratory action" before the Act becomes effective. The trial court observed that the State "is the only entity permitted to petition the court to deny pretrial release under the Act." Because state's attorneys are regulated by those provisions, they "have a clear interest in their constitutionality, as well as a cognizable injury should they be tasked with enforcing an unconstitutional act." The court further posited that state's attorneys and sheriffs may be forced to expend funds to abide by the Act, causing additional cognizable injuries that would support standing.

¶ 12    Regarding count I and the plaintiffs' argument that the Act was an improper attempt to amend the constitution, the trial court agreed. The court asserted that, "had the Legislature wanted to change the provisions in the Constitution regarding eliminating monetary bail as a surety, they should have submitted the question on the ballot to the electorate at a general election and otherwise complied with" article XIV, section 2, of the constitution. See *id.* art. XIV, § 2.

¶ 13        Regarding count III and the plaintiffs' argument that the pretrial release provisions of the Act violate the bail clause, the trial court asserted that that clause has a "much broader" purpose than simply conferring rights on criminal defendants. The court stated that bail "exists *** to balance a defendant's rights with the requirements of the criminal justice system, assuring the defendant's presence at trial, and the protection of the public." The court noted that the defendants did not explain why the Act "strips courts of the authority to ever consider monetary bail as a condition of pretrial release in every case." The court further noted that the plaintiffs "are not arguing to seek to require monetary bail in every case, but the Act *** eradicates monetary bail as a judicial consideration in every case." Citing a law review article from 1982, the court maintained that bail, or the pretrial release of a defendant after posting security to ensure appearance at trial, has been the centuries-long approach in this country. According to the trial court, persons are no longer bailable with sufficient sureties pursuant to the pretrial release provisions because sufficient sureties no longer include monetary bail.

¶ 14        Regarding count IV and the plaintiffs' argument that the pretrial release provisions of the Act violate the crime victims' rights clause, the trial court held that "eliminating monetary bail in all situations in Illinois[ ] prevents the court from effectuating the constitutionally mandated safety of the victims and their families." The court referred to article I, section 8.1(a)(9), and its use of the phrase "fixing the amount of bail." According to the trial court:

        "The plain reading of 'fixing the amount of bail' *** clearly refers to the requirement that the court consider the victims' rights in setting the amount of monetary bail as the court does and has done since the passage of this amendment. In eliminating monetary bail, the discretion constitutionally vested to the courts to protect victims and their families by this method is gone. The constitutional requirement of bail is meant to help ensure victims' safety, the defendant's compliance with the terms of release, and the defendant's appearance in court. The Act instead leaves courts with no 'amount of bail' to fix and confines the court to legislatively enacted standards for detention."

¶ 15        Regarding count V and the plaintiffs' argument that the pretrial release provisions of the Act violate the separation of powers clause, the trial court held that, because bail is an administrative matter for the courts, the legislature

encroached upon the authority of the judiciary. Relying upon *People ex rel. Hemingway v. Elrod*, 60 Ill. 2d 74, 79 (1975), the court surmised that the pretrial release provisions offend separation of powers principles embodied in the Illinois Constitution because the enactment strips the "courts of the authority to ever consider monetary bail as a condition of pretrial release," impermissibly impeding their inherent authority to detain defendants pending trial. Regarding count VII, the trial court rejected the plaintiffs' void-for-vagueness argument. Finally, regarding count VIII, the trial court found that a preliminary injunction was not appropriate because summary judgment was granted to the plaintiffs.

¶ 16    After entering its memorandum of decision, the trial court subsequently entered a written judgment granting the plaintiffs summary judgment with respect to counts I, III, IV, and V of their first amended complaint. The defendants appealed directly to this court under Rule 302(a). Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011). On December 31, 2022, this court issued an order staying the Act's provisions pending the outcome of this appeal. We allowed the Illinois Network for Pretrial Justice and 389 other individuals to file an *amici curiae* brief in support of the defendants' position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). We also allowed Chicago Fraternal Order of Police Lodge No. 7 and Sean Kennedy of the Maryland Public Policy Institute to file *amicus curiae* briefs in support of the plaintiffs' position.

¶ 17                                    ANALYSIS

¶ 18    We begin with bedrock principles that guide us in deciding constitutional claims.

¶ 19    The General Assembly "is without restriction or limit in the exercise of legislative power except as bounds are set or restrictions imposed by the constitution." *Sutter v. People's Gas Light & Coke Co.*, 284 Ill. 634, 640 (1918); accord *Droste v. Kerner*, 34 Ill. 2d 495, 498-99 (1966). Our role is not to judge the wisdom of legislation but only to determine when it offends the constitution. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 557 (2009) (" ' "[W]e do not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." ' " (quoting *Hayen v. County of Ogle*, 101 Ill. 2d 413, 421 (1984), quoting *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952))). The judiciary's power to

declare a statute unconstitutional is "the gravest and most delicate duty that [courts are] called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring, joined by Brandeis, Sanford, and Stone, JJ.). It is not an endeavor that we take lightly. If it is reasonably possible for us to conclude that a challenged statute is constitutional, we are obligated to do so. *Cwik v. Giannoulias*, 237 Ill. 2d 409, 416 (2010); *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306-07 (2008).

¶ 20        Statutes enjoy a strong presumption of constitutionality because the legislature is principally responsible for determining the public policy of our state. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 260 (2010) ("Because the formulation and implementation of public policy are principally legislative functions, the courts afford substantial deference to legislative enactments."); *People v. McCarty*, 223 Ill. 2d 109, 135 (2006). A party challenging the constitutionality of a statute bears the heavy burden of clearly establishing a constitutional violation. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007). Additionally, where, as here, the party challenging the statute has raised a so-called facial challenge, the burden is even more onerous. See *People v. Villareal*, 2023 IL 127318, ¶ 14; *Burns v. Municipal Officers Electoral Board of Elk Grove Village*, 2020 IL 125714, ¶ 13. The party must prove there is no imaginable set of circumstances under which the statute would be valid. *People v. Eubanks*, 2019 IL 123525, ¶ 34. The issue of whether a statute is constitutional presents a question of law, which this court reviews *de novo*. *People v. Austin*, 2019 IL 123910, ¶ 14.

¶ 21        "The construction of constitutional provisions is governed by the same general principles that apply to statutes." *Kanerva v. Weems*, 2014 IL 115811, ¶ 36. Our primary objective is "to determine and effectuate the common understanding of the citizens" who adopted the provisions. *Id.* To accomplish that objective, we "first and foremost" look to the plain language used in its natural and popular meaning when the constitutional provision was adopted. *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 47. Importantly, "[w]here the language of a constitutional provision is unambiguous, it will be given effect without resort to other aids for construction." *Kanerva*, 2014 IL 115811, ¶ 36.

¶ 22        Before addressing the three constitutional claims in this appeal, we must briefly address the plaintiffs' standing. Standing is a prudential doctrine that falls under the umbrella of justiciability. See *State ex rel. Leibowitz v. Family Vision Care, LLC*,

2020 IL 124754, ¶ 27 (" 'Standing "is not simply a procedural technicality" (59 Am. Jur. 2d *Parties* § 30, at 416 (1987)), but rather is an aspect or a component of justiciability.' " (quoting *In re Estate of Wellman*, 174 Ill. 2d 335, 344 (1996))). The plaintiff, however, need not allege facts establishing standing. *Id.* ¶ 29 (citing *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 22 (2004)). The defendant bears the burden to plead and prove lack of standing as an affirmative defense. *Id.*; *cf. Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988). Consequently, standing may be waived. See *Flynn v. Ryan*, 199 Ill. 2d 430, 438 n.1 (2002).

¶ 23      Standing is typically a threshold determination (see *Umrani v. Sindhi Ass'n of North America*, 2021 IL App (1st) 200219, ¶ 34), but this case is anything but typical. In its opening brief, the State referred to the "unusual circumstances of this case" and acknowledged "the public interest would be served by the adjudication of [the] plaintiffs' claims on the merits." We turn to those claims and their merits.

¶ 24                          I. THE BAIL CLAUSE

¶ 25      Count III of the plaintiffs' first amended complaint alleged that the pretrial release provisions of the Act violate the bail clause. Illinois's first constitution was ratified in 1818. Article VIII, section 13, of that document provided that "all persons shall be bailable by sufficient sureties," except those held for capital offenses. Ill. Const. 1818, art. VIII, § 13. The 1870 Illinois Constitution identically preserved that clause. Ill. Const. 1870, art. II, § 7. The Illinois Constitution of 1970, as amended, now similarly provides:

> "All persons shall be bailable by sufficient sureties, except for the following offenses where the proof is evident or the presumption great: capital offenses; offenses for which a sentence of life imprisonment may be imposed as a consequence of conviction; and felony offenses for which a sentence of imprisonment, without conditional and revocable release, shall be imposed by law as a consequence of conviction, when the court, after a hearing, determines that release of the offender would pose a real and present threat to the physical safety of any person." Ill. Const. 1970, art. I, § 9.

¶ 26    The trial court agreed with the plaintiffs and held that the pretrial release provisions violate the bail clause, but the court's reasoning is difficult to follow. The trial court acknowledged the defendants' position that "the bail provision exists to confer a right on criminal defendants," but it asserted the purpose of that provision is "much broader." The court continued, "Bail exists, as it has for centuries, to balance a defendant's rights with the requirements of the criminal justice system, assuring the defendant's presence at trial, and the protection of the public." Noting that the Act "eradicates monetary bail as a judicial consideration in every Illinois case," the trial court concluded that, "under the Act, *** 'persons are no longer bailable by sufficient sureties' pursuant to the pretrial release provision of the Act because 'sufficient sureties' does involve monetary bail as one the conditions of bail which is abolished with the Act."

¶ 27    We reject the trial court's uneven reasoning for three reasons.

¶ 28    First, the trial court ignored the plain language of the constitution. The bail clause does not include the term "monetary," so it did not cement the practice of monetary bail, however long-standing and prevalent across Illinois, into our constitution. "Sufficient sureties" is not limited to sufficient monetary sureties, and we cannot append or supplement the constitutional text.

¶ 29    Second, the trial court correctly recognized that the bail clause strikes a finely constructed balance between the interests of criminal defendants in pretrial release and the interest of the State "obtaining the greatest possible assurance" that the defendant will appear for trial (*People ex rel. Gendron v. Ingram*, 34 Ill. 2d 623, 626 (1966)), as well as the State's interest in public safety, but the court incorrectly assumed that abolishing monetary bail undermines the State's interests. The court appeared to believe that monetary bail is the only way to assure a defendant's presence and to protect the public. In doing so, the court elevated the system of monetary bail over the plain language of the bail clause. While the clause establishes an individual constitutional right to bail, that right is not absolute (see *Hemingway*, 60 Ill. 2d at 80) but conditioned by "sufficient sureties" and, more importantly, by exceptions intended to keep the most serious, and potentially dangerous, offenders in custody after a hearing to establish they pose a real and present threat.

¶ 30    The Act's pretrial release provisions complement the bail clause in that regard by allowing the State to seek, and the trial court to order, pretrial detention of certain criminal defendants. See 725 ILCS 5/110-2, 110-6.1 (West 2022). The Act requires the court to consider the "nature and seriousness of the real and present threat to the safety of any person or persons *** that would be posed by the defendant's release." See *id.* § 110-5(a)(4).

¶ 31    Third and relatedly, the trial court misapprehended what the drafters of the bail clause actually did. The drafters consciously chose to leave the clause largely identical to the 1870 Constitution, which was largely identical to the original 1818 Constitution. See 1 Record of Proceedings, Sixth Illinois Constitutional Convention 699 (describing the current bail clause as a "minor rephrasing" of the 1870 version, leaving "[t]he substance *** unchanged"). Thus, the historical antecedent for the meaning of "bailable by sufficient sureties" is the meaning of bail in 1818. See generally *People v. Moon*, 2022 IL 125959, ¶ 35.

¶ 32    As the State correctly observes, "monetary bail was all but unknown at the time the 1818 Constitution was drafted." A dictionary published that year defined bail as "the freeing or setting at liberty one arrested or imprisoned *** under security taken for his appearance" but did not mention money as the sole or even primary means of providing that security. 1 Samuel Johnson, A Dictionary of the English Language (H.J. Todd ed. 1818). Monetary bail emerged later in the mid-to-late nineteenth century. See *Holland v. Rosen*, 895 F.3d 272, 293 (3d Cir. 2018); see also *Leary v. United States*, 224 U.S. 567, 575 (1912) ("[t]he distinction between bail and suretyship is pretty nearly forgotten," and "[t]he interest to produce the body of the principal in court is impersonal and wholly pecuniary"). And a comprehensive system concerning pretrial release was not codified in Illinois for another century, when the General Assembly enacted the Code of Criminal Procedure in 1963, which contained article 110.

¶ 33    The drafters were cognizant of the legislature's foray into that area, which included section 110-8 of the Code and outlawed professional suretyship by bail bondsmen.[2] The drafters clearly understood that Illinois's approach to pretrial release had evolved since the State was established and clearly understood that

---

[2]That provision was approved by this court in *Ingram*, 34 Ill. 2d at 626, decided in 1966, only a few years before the Constitutional Convention in 1970.

approach would continue to evolve, and they used language that would allow that. Delegate Bernard Weisberg offered a minority proposal that would have allowed all criminal defendants to remain at large until convicted, unless there was a judicial determination that confinement or bail was necessary to assure a defendant's presence at trial. That proposal was ultimately rejected, and Delegate Roy Pechous explained why it should be:

> "I recognize, as our committee has recognized, that there are problems and inequities in the present bail system. However, the time-honored language of [the 1870 Constitution] has *** permitted the legislature to delve into the problems and to do something about them, and—as the present statutory language that was presented to the Convention indicates—the legislature has taken up the cudgel and has done something about it. ***

> *** I think that it is important, considering the fact that we have—as I say—time-honored language that has created very little litigation and has permitted the legislature to operate in the vacuum, recognizing constitutionally that there is a right to bail and permitting the legislature and the courts to construe the particulars of how the bail system should exist and how it should operate, I think it is important that we retain the present language with the very minor amendment that our committee has made with respect to one comma.

> *** And I think that the present language and the case law that has construed it—or pardon me, the legislative action that has operated to guide the administration of bail—I think that they are completely adequate, and I think that the bail structure in the state of Illinois is well on its way to being better than it is now; and I said before, it is a great deal better than it was four years ago." See 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1674-75 (comments of Delegate Pechous).

¶ 34     Legislative latitude in regulating pretrial release, thus, was a fundamental underpinning of the bail clause. The legislature has once again engaged in the process of bail reform, and its efforts are consistent with the drafters' intent. The plaintiffs' bail clause claim fails.

¶ 35                    II. THE CRIME VICTIMS' RIGHTS CLAUSE

¶ 36        Count IV of the plaintiffs' first amended complaint alleges that the pretrial release provisions violate the crime victims' rights clause. Initially adopted in 1992 and since amended, article I, section 8.1, of the Illinois Constitution sets out the constitutional rights of crime victims in Illinois and now includes 12 explicitly defined "rights" that crime victims "shall" have. Ill. Const. 1970, art. I, § 8.1. The crime victims' enumerated rights include, *inter alia*, "[t]he right to have the safety of the victim and the victim's family considered in denying or fixing the amount of bail, determining whether to release the defendant, and setting conditions of release after arrest and conviction." *Id.* § 8.1(a)(9).

¶ 37        The trial court agreed with the plaintiffs. The court stated that "the plain reading" of "fixing the amount of bail *** clearly refers to the requirement that the court consider victims' right in the setting of the amount of monetary bail." The trial court continued that, by removing that method of ensuring victims' safety, the legislature improperly removed the discretion constitutionally given a trial court by the clause. According to the trial court, the Act leaves a court with no "amount of bail" to fix, impairing its ability to protect victims and their families.

¶ 38        We reject the trial court's reasoning for three reasons.

¶ 39        First, the trial court again ignored the plain language of the constitution. The crime victims' rights clause mentions the "amount of bail," not the amount of monetary bail. The word "amount" connotes quantity and does not only mean a quantity of money but rather, consonant with the bail clause, a quantity of sufficient sureties.[3]

¶ 40        Second, the trial court appeared to forget that the pretrial release provisions of the Act expressly take crime victims into account. As we have already mentioned, those provisions require a court to consider the "nature and seriousness of the real and present threat to the safety of any person or persons that would be posed by the defendant's release," including crime victims and their family members, "as required under" the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1

---

[3]To the extent that "amount" may imply an amount of money, the crime victims' rights clause simply reflected the reality of Illinois's bail system at the time it was adopted. That reality has changed.

*et seq.* (West 2022)). See 725 ILCS 5/110-5(a)(4) (West 2022). The provisions also require the court to give notice to crime victims before holding a pretrial release hearing, before revoking a condition of pretrial release, and in a range of other contexts. See *id.* §§ 110-5(a)(j), 110-6(h), 110-6.1(m). Thus, the pretrial release provisions secure, rather than contravene, the rights guaranteed by the clause, in that they require the court to consider the safety of victims at every stage at which the court determines whether and on what conditions a defendant should be released.

¶ 41    Third, the trial court failed to grasp that, like the bail clause, the crime victims' rights clause is part of the bill of rights. Both are equally important and work in concert. The bail clause concerns the individual rights of criminal defendants, but in its "real and present threat" exception, it acknowledges the State's interest in public safety. The crime victims' rights clause, initially adopted in 1992, not only bolstered that interest but created a new and watershed structure of individual rights for crime victims. The latter clause was adopted with only one focus, victims. See *People v. Richardson*, 196 Ill. 2d 225, 231 (2001) (stating that the crime victims' rights clause was intended to serve as a shield to protect the rights of victims). We believe that it would dilute the purpose of that clause to hold that it had another, tangential purpose—namely, to mandate a system of monetary bail for criminal defendants across Illinois. Nothing in the crime victims' rights clause's plain language indicates such an intent to upend suddenly, after 174 years, the constitutional history of bail in Illinois. See *People v. Nestrock*, 316 Ill. App. 3d 1, 10 (2000) (stating that the clause does "not alter the fundamental principles on which our legal system is based"). The plaintiffs' crime victims' rights clause claim fails.

¶ 42                    III. THE SEPARATION OF POWERS CLAUSE

¶ 43    Count V of the plaintiffs' first amended complaint alleges that the pretrial release provisions of the Act violate the separation of powers clause. Article II, section 1, of the Illinois Constitution provides, "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1.

¶ 44    The trial court agreed with the plaintiffs. According to the trial court, this court has held that the legislature is expressly prohibited from exercising judicial power (see *People v. Jackson*, 69 Ill. 2d 252, 256 (1977)), and statutes that undermine traditional and inherent judicial roles violate separation of powers (*Best v. Taylor Machine Works*, 179 Ill. 2d 367, 411 (1997)). Relying upon *Hemingway*, 60 Ill. 2d at 79, the trial court concluded that the authority to deny or revoke bail to preserve the orderly process of criminal procedure is an administrative matter inherently entrusted solely to the courts. The trial court added that, by encroaching on that authority in abolishing monetary bail, the legislature violated the separation of powers clause.

¶ 45    We reject the trial court's reasoning and, particularly, its overreading of *Hemingway*.

¶ 46    In *Hemingway*, the defendant was charged with capital murder, and the trial court denied his motion to set bail. *Id.* at 76. The defendant filed a motion for leave to file a petition for a writ of *habeas corpus*, which this court granted. *Id.* After noting that the bail clause contained an exception for capital offenses, this court found that the defendant was not eligible for the death penalty under *Furman v. Georgia*, 408 U.S. 238 (1972), and was therefore bailable. *Hemingway*, 60 Ill. 2d at 79. Still, we declined the defendant's invitation to reverse the trial court's decision to deny bail. We stated, "the constitutional right to bail must be qualified by the authority of the courts, as an incident of their power to manage the conduct of proceedings before them, to deny or revoke bail when such action is appropriate to preserve the orderly process of criminal procedure." *Id.* We added that courts have "the inherent power" to deny bail when the defendant may interfere with witnesses or may not appear for trial. *Id.* at 80.

¶ 47    The issue in *Hemingway*, however, did not involve whether the defendant had a right to a set amount of monetary bail but whether he had a right to bail at all. That is, we decided the very narrow question of whether a trial court has the inherent authority to deny pretrial release. Having decided that question, we drifted into *obiter dicta*. We declined to endorse "the principle of preventative detention," finding it unnecessary "to discuss the wisdom or the constitutionality of that principle." *Id.* Instead, we noted that "[t]he object of bail *** is to make certain the defendant's appearance in court" but acknowledged "the need to balance the right

- 15 -

of an accused to be free on bail against the right of the general public to receive reasonable, protective consideration by the courts." *Id.* at 81. We reviewed the American Bar Association's Standards Relating to Pretrial Release and linked them to provisions in article 110 of the Code that provide conditions for admitting a defendant to bail. *Id.* at 81-84 (citing ABA Standards Relating to Pretrial Release (1968)). We surmised that those standards and Code sections, when properly applied, achieved "an appropriate balance" between "the right of an accused to be free on bail pending trial and the need of the public to be given necessary protection." *Id.* at 84. If we believed that bail was exclusively a matter for the judiciary, we would not have quoted those statutory provisions. Further, since we construed it in *Hemingway*, the bail clause has been amended twice to broaden the exceptions beyond simply capital offenses.

¶ 48        Indeed, the legislature has long regulated the bail system. In 1963, the General Assembly codified, for the first time, criminal procedure in Illinois. The Code included detailed standards and procedures for Illinois courts to utilize in determining how and when a criminal defendant can be detained or should be released from custody prior to trial. See Ill. Rev. Stat. 1965, ch. 38, § 110-1 *et seq.* In the nearly six decades between then and the passage of the Act in 2021, the legislature has revised article 110 more than 20 times. Specifically, before the Act, section 110-5(a) identified a dizzying array of more than 100 factors that a court "shall" consider in "determining the amount of monetary bail or conditions of release." See 725 ILCS 5/110-5(a) (West 2020). The plaintiffs (or their predecessors in office) never faulted the legislature's earlier forays into this area. Presumably, they found those amendments palatable. However, the substance of the amendment is irrelevant. If the legislature could reconsider bail over the course of so many years, it could do so again in 2021 without offending separation of powers principles.

¶ 49        Our conclusion is consistent with other areas of criminal procedure. For example, this court has held that sentencing is exclusively a judicial function (see *People v. Davis*, 93 Ill. 2d 155, 161 (1982)) but has also held that " 'the legislature may restrict the exercise of judicial discretion in sentencing, such as by providing for mandatory sentences' " (*People v. Taylor*, 102 Ill. 2d 201, 208 (1984) (quoting *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531, 549 (1979)). The plaintiffs'

separation of powers claim fails.

¶ 50                                    CONCLUSION

¶ 51     The Illinois Constitution of 1970 does not mandate that monetary bail is the only means to ensure criminal defendants appear for trials or the only means to protect the public. Our constitution creates a balance between the individual rights of defendants and the individual rights of crime victims. The Act's pretrial release provisions set forth procedures commensurate with that balance. For the reasons that we have stated, we reverse the circuit court's decision to grant summary judgment in favor of plaintiffs.

¶ 52     On December 31, 2022, this court granted a supervisory order staying the effect of pretrial release provisions in Public Acts 101-652 and 102-1104, along with various amendments to Illinois Supreme Court rules that facilitated the implementation of those provisions. See *People ex rel. Berlin v. Pritzker*, No. 129249 (Ill. Dec. 31, 2022) (supervisory order). Sixty days after the filing of this opinion, on September 18, 2023, this court's stay of pretrial release provisions in Public Acts 101-652 and 102-1104 shall be vacated. On that date, the circuit courts are directed to conduct hearings consistent with Public Acts 101-652 and 102-1104, and Illinois Supreme Court Rules implementing those pretrial release provisions shall become effective. See 5 ILCS 70/1.11 (West 2022).

¶ 53     Circuit court judgment reversed.

¶ 54     JUSTICE O'BRIEN, specially concurring:

¶ 55     I concur with the majority's finding with respect to the constitutionality of Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness, and Equity-Today Act (Act), as amended by Public Act 102-1104 (eff. Jan. 1, 2023). Specifically, I agree that the pretrial release provisions of the Act do not violate the Illinois Constitution's bail clause (Ill. Const. 1970, art I, § 9), crime victims' rights clause (*id.* § 8.1(a)(9)), or separation of powers clause (*id.* art. II, § 1). I write separately, however, to highlight the majority's failure to

address defendants' affirmative defense that plaintiffs lack standing, which defendants pled in their summary judgment motion before the trial court. Furthermore, upon reviewing this issue, I find that defendants cannot satisfy their burden of proof with regard to standing due to certain representations defendants made during oral argument.

¶ 56        At the outset, I agree with Justice Overstreet that the majority has given "short shrift" to the issue of standing. *Infra* ¶ 67. I also agree with Justice Overstreet's statement that "[t]he majority skirts this issue and does not address it." *Infra* ¶ 70. Simply put, the majority's offering fails to offer any substantive analysis as to the question of plaintiffs' standing. More importantly, the majority's offering fails to provide a dispositive answer on the issue. Instead, after citing authority for the proposition that standing "may be waived" (*supra* ¶ 22), the majority "analysis" provides, in its entirety:

> "Standing is typically a threshold determination [citation], but this case is anything but typical. In its opening brief, the State referred to the 'unusual circumstances of this case' and acknowledged 'the public interest would be served by the adjudication of [the] plaintiffs' claims on the merits.' We turn to those claims and their merits." *Supra* ¶ 23.

¶ 57        The majority notes that "standing is typically a threshold determination" (*supra* ¶ 23) but then curiously fails to offer *any* determination on the threshold matter. In scenarios where a trial court or the appellate court engages in such behavior, we often issue a supervisory order or an opinion remanding the matter to the respective court with instructions to analyze and answer the threshold matter or operative question. Moreover, it must be emphasized that a case's "unusual circumstances" or the "public['s] interest" in a case (see *supra* ¶ 23) are not relevant factors Illinois courts utilize when attempting to determine whether a plaintiff has common-law standing to pursue a claim. Instead, the operative factor in Illinois is whether the plaintiff has suffered an injury or is in immediate danger of sustaining an injury. *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL 127126, ¶ 13; *Piccioli v. Board of Trustees of the Teachers' Retirement System*, 2019 IL 122905, ¶ 12; *Chicago Teachers Union, Local 1 v. Board of Education of Chicago*, 189 Ill. 2d 200, 206 (2000); *Messenger v. Edgar*, 157 Ill. 2d 162, 171 (1993); *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). In other

words, "[t]he function of the doctrine of standing is to insure that issues are raised only by those parties with a real interest in the outcome of the controversy." *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004). "In more pedestrian terms, it is an answer to the very first question that is sometimes rudely asked when one person complains of another's actions: 'What's it to you?' " Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881, 882 (1983).

¶ 58    The asking *and answering* of this question has a long history within American jurisprudence. Its earliest philosophical seedlings can be found scattered throughout the United States Supreme Court's decision in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). One such example: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, *whenever he receives an injury*." (Emphasis added.) *Id.* at 163. Beginning in the 1920s, those philosophical seedlings began to sprout and continued to develop over the following decades into what we now recognize today as the doctrine of standing. While standing requirements apply in both Illinois's federal and state courts today, the doctrine in the federal system is not perfectly interchangeable with the doctrine in the state system. It must also be noted that the issue of standing arises *generally* in at least three different types of legal scenarios: (1) statutorily, (2) constitutionally, and (3) under the common law, which must be pled as an affirmative defense in Illinois state courts. The determination of the applicable scenario depends upon both the type of claim being raised by plaintiff and the particular court system in which plaintiff is raising said claim. This fact is but one of many reasons why the doctrine of standing and its application are often confusing for both courts and litigants.

¶ 59    The instant case, however, does not require this court to wade into the depths of standing jurisprudence. Here, defendants present the question of standing to us as an affirmative defense, which defendants have the burden to plead and prove. See *Chicago Teachers Union, Local 1*, 189 Ill. 2d at 206. Based on defendants' representations at oral argument, I cannot say defendants have met their burden.

¶ 60    In defendants' motion for summary judgment, defendants raised a challenge to plaintiffs' standing to bring suit challenging the Act's pretrial release provisions. Before this court, however, defendants acknowledged that plaintiffs suffered an

injury as a result of the Act's pretrial release provisions. Specifically, I note the following exchange at oral argument:

> "JUSTICE O'BRIEN: Sir, are you making *** a standing argument that if someone were to raise this claim in terms of the crime victims clause that it needs to be a crime victim rather than the State [and] can you address the [standing] question in terms of the separation of powers claim, who is the aggrieved party ***?

> ALEX HEMMER (COUNSEL FOR DEFENDANTS): Yes, Justice O'Brien. So as to the first question, yes, we are making a form of standing argument with respect to the crime victims' rights clause. *Now, we aren't arguing across the board that plaintiffs aren't injured in the constitutional sense by the pretrial release provisions*. We aren't arguing that the Court should toss the entire case. We are invoking the rule that plaintiffs generally have to assert their own rights, they can't assert the rights of third parties like crime victims and criminal defendants and so that comes up here in the context of the crime victims' rights clause, and it comes up a couple of other places in the case too, but we aren't making an across-the-board standing argument, and we aren't making a standing argument that would apply to plaintiffs' separation of powers claim." (Emphasis added.)

¶ 61 As I discussed above, a plaintiff has standing where there has been some injury to a legally cognizable interest. This means that the claimed injury, whether actual or threatened, must be distinct and palpable, traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the requested relief. *Greer*, 122 Ill. 2d at 492-93. Stated more simply: No injury caused by defendant, no standing for plaintiff.

¶ 62 Here, plaintiffs brought an action against defendants, whereby they challenged the constitutionality of the Act. Defendants, in turn, challenged plaintiffs' standing. The trial court found that plaintiffs would suffer a cognizable injury if they were tasked with abiding by and enforcing the Act. On appeal, defendants expressly acknowledged at oral argument that they are not arguing "*that plaintiffs aren't injured in the constitutional sense by the pretrial release provisions*." (Emphasis added.) In essence, defendants have conceded that plaintiffs have suffered an injury and therefore plaintiffs have their own individual "real interest in the outcome of

the controversy." *Wexler*, 211 Ill. 2d at 23. Accordingly, I cannot say that defendants have carried their burden of proving plaintiffs' lack of standing.

¶ 63    In coming to this conclusion, I offer no opinion on whether plaintiffs *in fact* have standing to pursue their claims. "Under Illinois law, a plaintiff need not allege facts establishing standing." *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 45 (2005). Also, I need not reach the question addressed by the dissent—whether plaintiffs have *statutory* standing to defend the constitutional rights of crime victims and their families. Likewise, I offer no opinion on whether plaintiffs can pursue their declaratory judgment action on behalf of the Illinois judiciary (separation of powers) or individual defendants who will now be subject to the pretrial release provisions of the Act (bail clause). Instead, I would simply hold that defendants cannot satisfy their burden of proof with regard to standing considering their admission that plaintiffs have been injured as a result of the Act.

¶ 64    JUSTICE OVERSTEET, dissenting:

¶ 65    I respectfully dissent from my colleagues' conclusion that the pretrial release provisions of Public Act 101-652 (eff. Jan. 1, 2023) (Act), as amended by Public Act 102-1104 (eff. Jan. 1, 2023), do not offend any principles embodied in our state's constitution. On the contrary, the legislature's abolishment of monetary bail is in direct violation of the plain language of our constitution's bill of rights and, more specifically, the vested rights of crime victims set out in article I, section 8.1, of the Illinois Constitution. Ill. Const. 1970, art. I, § 8.1(a)(9). Therefore, this court has an absolute obligation to declare the pretrial release provisions of the Act to be invalid and unenforceable no matter how beneficial the abolishment of monetary bail may be.

¶ 66                    I. Standing

¶ 67    At the outset, I first note that the majority has given short shrift to an issue that was vigorously contested in the proceedings before the circuit court and before this court. That issue concerns the standing of plaintiffs to bring this lawsuit, particularly their standing to challenge the constitutionality of the pretrial release

- 21 -

provisions of the Act on the basis that the legislation violates our constitution's bill of rights. Several plaintiffs, as state's attorneys, are constitutional officeholders who brought this action on behalf of the citizens of their respective counties. Our Attorney General expressly told this court, in defendants' brief and during oral argument, that state's attorneys have no power to do so.

¶ 68    I am compelled to address the full merits of this issue, as I believe that is this court's obligation to the public. This standing issue concerns the proper role of constitutional officeholders in a dispute involving the interpretation of our constitution, and the issue is squarely before this court; it is contested and has not been waived. The public is owed an answer.

¶ 69    In the proceedings below, defendants argued that plaintiffs' complaint failed to raise an actual controversy because the named defendants do not enforce the pretrial provisions of the Act. Defendants argued that a judgment against the named defendants cannot provide plaintiffs with any relief. In this appeal, however, defendants stated in their brief that they are not raising this narrow issue due to "the unusual circumstances of this case." They explained that this court exercises "supervisory authority" over the courts that do enforce the pretrial release provisions and, in addition, that "the public interest would be better served by the adjudication of plaintiffs' claims on the merits." Defendants cite *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 253 (2010), for the proposition that justiciability may be waived. Therefore, defendants elected not to make an issue with respect to whether plaintiffs have named the proper defendants.

¶ 70    In making this concession, defendants did not ask this court to address all of plaintiffs' constitutional claims on their merits, contrary to what the majority suggests.[4] Although acknowledging the importance of resolving the merits of plaintiffs' claims to the citizens of this state, defendants told us we should *not* consider the plaintiffs' claim that the Act's pretrial release provisions violate our constitution's bill of rights because, defendants assert, plaintiffs lack sufficient

---

[4]In their brief and at oral argument, defendants stated that they were waiving their standing argument only with respect to plaintiffs' claim that the pretrial release provisions violate the separation of powers clause in the constitution (Ill. Const. 1970, art. II, § 1).

*personal* interest in crime victims' vested constitutional rights to bring this challenge. The majority skirts this issue and does not address it.

¶ 71      In support of their argument, defendants maintain and are correct that, as a general rule, a proponent must assert his or her own legal rights and interests, rather than basing his or her claim for relief upon the rights of third parties, citing *State v. Funches*, 212 Ill. 2d 334, 346 (2004). However, defendant's argument based on general standing principles applicable to individual citizens bringing lawsuits is flawed because the argument entirely overlooks standing principles that apply directly to state's attorneys in actions that concern the interests of the citizens of their counties and the citizens of this state.

¶ 72      Here, we are concerned with the standing requirements to bring a declaratory judgment action. We apply the declaratory judgment remedy liberally and do not restrict it with "unduly technical interpretations." *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443, 452 (1979). Section 2-701(a) of the Code of Civil Procedure provides for declaratory judgment actions as follows:

> "The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested." 735 ILCS 5/2-701(a) (West 2020).

¶ 73      Based on this statutory language, we have held that there are essentially two main requirements for standing to bring an action for declaratory relief: (1) the case must present "a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof" (actual controversy), and (2) the party bringing the declaratory judgment action must "possess a personal claim, status, or right which is capable of being affected" (interest in the controversy). *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375-76 (1977).

¶ 74                          A. Actual Controversy

¶ 75        Here, plaintiffs' complaint satisfies the standing requirement of an actual controversy because, as defendants concede in their brief, this court's resolution of plaintiffs' claims "on their merits" serves the "public's interest." The majority and I agree with defendants' assessment of the public interests at stake in resolving the merits of plaintiffs' constitutional challenge to the statute. Accordingly, the first requirement for standing is met. Defendants have implicitly recognized that plaintiffs are, in fact, asking the court to decide an "actual controversy," one of great public import, and are not merely asking the court to answer "abstract questions." See *Lebron*, 237 Ill. 2d at 252 (the standing doctrine seeks to ensure that courts decide actual controversies and not abstract questions); *Kluk v. Lang*, 125 Ill. 2d 306, 315 (1988) ("[Standing] is not meant to preclude a valid controversy from being litigated."). This is true because the merits of issues before this state's highest court, the resolution of which directly impacts the public's interest, defy categorization as abstract questions. Instead, claims raised before us that directly impact the public's interest are actual controversies worthy of our consideration.

¶ 76                       B. Interest in the Controversy

¶ 77        Although acknowledging the importance of resolving the merits of plaintiffs' claims to the citizens of this state, defendants, nonetheless, ask us to decline consideration of plaintiffs' constitutional claims on their merits (except for the separation of powers issue) on the basis that plaintiffs lack sufficient *personal* interest in protecting crime victims' vested constitutional rights. Defendants' argument on this point makes no mention of the statutory and constitutional powers and duties of state's attorneys.

¶ 78              1. *State's Attorneys' Statutory Duty to Commence and Prosecute Civil Actions That Concern the Public Interest*

¶ 79        The legislature has, by statute, assigned state's attorneys with the power and duty of commencing and prosecuting "*all actions*, suits, indictments and prosecutions, *civil and criminal*, in the circuit court for his county, *in which the people of the State or county may be concerned*." (Emphases added.) 55 ILCS 5/3-

9005(a)(1) (West 2020). This statutory duty provides the state's attorney plaintiffs in this case with statutory standing to raise the constitutional challenges that are set out in their declaratory judgment action.

¶ 80       For example, in *American Federation of State, County & Municipal Employees, Council 31 v. Ryan*, 347 Ill. App. 3d 732, 735-36 (2004), *appeal denied*, 211 Ill. 2d 569 (2004), the state's attorney of Madison County and other plaintiffs brought a civil action against the Department of Human Services (Department) and the governor to enjoin the defendants from closing the civil unit of the Alton Mental Health Center. The civil unit provided care to patients who were civilly committed. *Id.* at 735. The Department ran the Alton Mental Health Center and sought to close the civil unit due to a reduction in funding. *Id.* The Department planned to transfer civil unit patients to another facility or private hospitals or discharge them to nonresidential mental health services in the community. *Id.*

¶ 81       The state's attorney had no *personal* interest in the Department's closing of the facility's civil unit. Nonetheless, the state's attorney filed a lawsuit seeking to enjoin the Department from closing the civil unit until the Department complied with the requirements of the Illinois Health Facilities Planning Act (Planning Act) (20 ILCS 3960/1 *et seq.* (West 2002)). *Ryan*, 347 Ill. App. 3d at 735. The circuit court agreed with the state's attorney and entered an order enjoining the Department from closing the facility and ordered the Department to follow the procedures set out in the Planning Act. *Id.*

¶ 82       On appeal, the defendants argued that the state's attorney lacked standing to bring the action. *Id.* The defendants argued that the Planning Act does not allow for suits by state's attorneys to enforce its provisions. *Id.* at 736. The appellate court, however, noted that "[o]ne important duty of the State's Attorney is to 'commence and prosecute all actions, suits, indictments[,] and prosecutions, *civil and criminal*, in the circuit court for his county, in which the people of the State or county may be concerned.' " (Emphasis in original.) *Id.* at 741 (quoting 55 ILCS 5/3-9005(a)(1) (West 2002)). The appellate court held that "[a]ccess to quality local mental health care services and the opportunity to participate in the permit process through public hearings [citation] are matters of public interest in which the people of Madison County have an interest." *Id.* The appellate court, therefore, held that the state's attorney had standing to bring the suit.

¶ 83    Likewise, in the present case, similar to the defendants in *Ryan*, defendants here assert that the crime victims' rights clause in the constitution does not allow for suits by state's attorneys to assert crime victims' rights enumerated in article I, section 8.1. However, it is self-evident that the legislature's infringement on a vested constitutional right, the purpose of which is to protect the safety of crime victims and their families, is a matter of considerable public interest for the people in each of the state's attorneys' respective counties and for every citizen of this state; this conclusion requires neither citation nor analysis, as its truth is plainly evident.

¶ 84    Therefore, a state's attorney-initiated lawsuit to defend the vested constitutional rights of crime victims and their families falls squarely within the state's attorneys' statutorily defined duties in section 3-9005(a)(1) of the Counties Code. 55 ILCS 5/3-9005(a)(1) (West 2020) Accordingly, the state's attorneys in this case have standing to bring this constitutional claim the same as the state's attorney's standing in *Ryan* to challenge the Department's closing of the civil unit of the Alton Mental Health Center.

¶ 85    Our "extended line of cases" has "always viewed" the state's attorney as "the one to *represent the county or People in matters affected with a public interest*." (Emphasis added.) *People ex. rel. Kunstman v. Nagano*, 389 Ill. 231, 249 (1945). State's attorneys, therefore, have comprehensive standing to file suit with respect to matters that concern the public's interest, unlike individual citizens in the cases cited by defendants. Although the legislature has defined this power in broad terms, state's attorneys are entrusted with this statutory power because it is presumed "that [the state's attorney] will act under such a heavy sense of public duty and obligation for enforcement of all our laws that he [or she] will commit no wrongful act." *Id.* at 252. As we stated in *County of Cook ex rel. Rifkin v. Bear Stearns & Co.*, 215 Ill. 2d 466, 481 (2005), "if the voters are unsatisfied with the State's Attorney's manner of discharging his duties, they have a remedy every four years in the election booth."

¶ 86    In challenging standing, defendants maintain that the crime victims' rights clause makes it clear that only crime victims have standing to assert any of the rights enumerated in article I, section 8.1, and only in a pending criminal case. Ill. Const. 1970, art. I, § 8.1(b) ("The victim has standing to assert the rights

enumerated in subsection (a) in any court exercising jurisdiction *over the case*." (Emphasis added.)). While this provision provides for crime victims' standing to assert their rights in a particular case, contrary to defendants' assertion, nothing in the language of the clause prohibits declaratory judgment actions by state's attorneys seeking to invalidate legislative enactments that unlawfully infringe on any of the constitutional rights enumerated in the clause.

¶ 87 Furthermore, the crime victims' rights provision in the Illinois Constitution, in conjunction with the legislature's enactments designed to give effect to those enumerated rights, creates statutory duties of state's attorneys with respect to enforcing and giving effect to crime victims' rights.[5] These statutory duties provide additional grounds for the state's attorneys to have standing to challenge the legislature's infringement on crime victims' constitutionally protected rights.

¶ 88                                  2. *State's Attorneys' Statutory Duties Specific to*
*Crime Victims' Rights*

¶ 89 The legislature has set out the statutory scheme for enforcement of crime victims' constitutional rights in the Rights of Crime Victims and Witnesses Act (Crime Victims Act) (725 ILCS 120/1 *et seq.* (West 2020)). The Crime Victims Act expressly states that the "prosecuting attorney *** *may assert the victim's rights*." (Emphasis added.) *Id.* § 4.5(c-5)(3). Section 4.5(c-5)(4) of the Crime Victims Act further defines the duties of the prosecuting attorney in seeking enforcement of victims' rights and, alternatively, what the prosecutor must do *if* the prosecutor elects not to assert or seek enforcement of a victim's rights. *Id.* § 4.5(c-5)(4). I agree with the Attorney General that "[s]ection 4.5(c-5)(4) places the primary responsibility to assert and enforce a victim's right on the prosecuting attorney." Ill. Att'y Gen., Violence Prevention and Crime Victim Serv. Div., *Enforcement of Crime Victims' Rights: A Handbook for the Prosecution Team and Advocates*, at 8

---

[5]Although the crime victims' rights clause in the constitution states that "[n]othing in this Section shall be construed to alter the powers, duties, and responsibilities of the prosecuting attorney" (Ill. Const. 1970, art. I, § 8.1(b)), nothing in this plain language prohibits *the legislature* from altering the statutory powers, duties, and responsibilities of state's attorneys in order to give effect to crime victims' constitutional rights, and it has done just that.

(2021), https://ag.state.il.us/victims/IL%20OAG%20Crime%20Victims%20 Manual_0721.pdf [https://perma.cc/74JB-9HSR].

¶ 90   Moreover, as plaintiffs observe, under the legislature's statutory scheme under the Act, the state's attorney is the only party permitted to petition the court to deny pretrial release and must abide by the requirements in those sections of the pretrial release provisions of the Act (Pub. Act 101-652, § 10-255 (eff. Jan. 1, 2023) (amending 725 ILCS 5/109-1(b)(4), 110-6.1); Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (same)). Section 4.5 of the Crime Victims Act sets out requirements that state's attorneys and circuit courts must follow to ensure that the constitutional and statutory rights of crime victims are honored during criminal proceedings. 725 ILCS 120/4.5 (West 2020). Subsection (c) requires the circuit court to "ensure that the rights of the victim are afforded" (*id.* § 4.5(c)), and subsection (c-5)(3) states that prosecuting attorneys "may assert the victim's rights" (*id.* § 4.5(c-5)(3)).

¶ 91   The pretrial release provisions of the Act alter article 110 of the Code of Criminal Procedure of 1963 (Code) in a way that prohibits state's attorneys from arguing for a monetary bail "amount" that would serve the safety interests of crime victims and their families in all criminal cases in Illinois. This impact on the state's attorneys' official duties supports the standing of state's attorneys to challenge the Act's unconstitutional infringement on crime victims' constitutional rights. It cannot be said that state's attorneys have merely a curious concern about the pretrial release provisions' infringement on our constitution's bill of rights or are strangers to the dispute because their *personal* interests are not at stake.

¶ 92   Likewise, the state's attorneys' interest in this controversy cannot be seriously described as merely a generalized grievance common to all members of the public. The remedies sought by the state's attorneys, if granted, would allow them to fulfill their statutory duties that they owe to the people of their respective counties, stemming from their statutory responsibility to give effect to victims' constitutional rights by advocating for a specific "amount" of bail that takes into account the safety of victims and their families. As it stands, state's attorneys would be prohibited from fulfilling this statutory duty under the Act's pretrial release provisions.

¶ 93   The state's attorneys, therefore, have shown sufficient interest in this actual controversy; they have established that their official statutory duties are "capable

of being affected" by granting their requested relief. See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 493 (1988); *Illinois Gamefowl Breeders Ass'n*, 75 Ill. 2d at 450-51. Because of their duties stemming from the crime victims' rights clause and the Crime Victims Act, the state's attorneys' interest in the matter is more than adequate "to assure sufficient sharpness in defining the issues so that the court may be aided in deciding the case," which is the very "purpose" of the standing requirement. *Kluk*, 125 Ill. 2d at 315; see J.E. Keefe Jr., Annot., *Interest Necessary to Maintenance of Declaratory Determination of Validity of Statute or Ordinance*, 174 A.L.R. 549, § 12 (1948) ("It seems that where the duties, powers, or emoluments of a public official may be directly affected by a statute or ordinance, the official has a sufficient interest to obtain a declaration of the validity of the statute or ordinance, assuming of course that the other elements necessary to raise a justiciable controversy are present.").

¶ 94                              3. *State's Attorneys' Power and Duties*
                                  vis-à-vis *the Attorney General*

¶ 95       In addition to a state's attorney's statutory duties under the Counties Code and under the Crime Victims Act, the analysis of a state's attorney's standing to bring actions on behalf of the citizens of her county to challenge the constitutionality of a statute must also account for the *constitutional* nature of the office that she holds. Defendants' argument on appeal fails to offer any discussion on this point.

¶ 96       A state's attorney is a constitutional officer with rights and duties "analogous to or largely coincident with the Attorney General." *Nagano*, 389 Ill. at 249. Therefore, because our state's attorneys' powers and duties are largely coincident with the attorney general, in analyzing their standing to challenge the constitutionality of the Act, it is relevant to consider the attorney general's standing to challenge the constitutionality of a state statute.

¶ 97       The office of the attorney general has roots that extend to the Crown of England under common law. *People ex rel. Barrett v. Finnegan*, 378 Ill. 387, 392 (1941). Therefore, in Illinois, the attorney general has all the powers known at common law in addition to any further duties imposed by the legislature. *Id.* at 392-93. As a result, the attorney general "may exercise all such power and authority as public interest" requires and may bring all such suits necessary for "the protection of

public rights." *Id.* at 393. Like a state's attorney's statutory power under the Counties Code, the attorney general's constitutional powers include the power to "maintain an action in any case which affects the public generally." *Id.*

¶ 98     With respect to state's attorneys' constitutional power, we have consistently held that a state's attorney's constitutional power mirrors that of the attorney general. For example, in *Rifkin*, we stated that, similar to the attorney general, the powers of a state's attorney are derived from the constitution. *Rifkin*, 215 Ill. 2d at 475. We explained, "[i]t is because the office of State's Attorney was created by the constitution and *functions like the Attorney General in his or her own county that the State's Attorney is deemed to have constitutional powers similar to those of the Attorney General*." (Emphasis added.) *Id.* at 478. Based on their parallel constitutional powers, we have "blurred the line between the authority of the Attorney General and that of State's Attorneys." *People ex rel. Alvarez v. Gaughan*, 2016 IL 120110, ¶ 31.

¶ 99     In *People v. Pollution Control Board*, 83 Ill. App. 3d 802, 806 (1980), the appellate court astutely observed that "the Attorney General's duty to defend the constitution necessarily encompasses a duty to challenge, on behalf of the public, a statute which the Attorney General regards as constitutionally infirm." See also *People ex rel. Scott v. Chicago Park District*, 66 Ill. 2d 65, 68 (1976) (where the attorney general brought an action to declare a senate bill void). State's attorneys, likewise, have the same constitutional power to challenge constitutionally infirm statutes when the public's interest is negatively impacted.[6]

¶ 100    The legislature may not take away the constitutional powers of either the attorney general or state's attorneys, and this court may not do so either. The

---

[6]Although state's attorneys have broad power to bring suits where the public's interest is at stake, this power does not preclude the courts, in lawsuits brought by state's attorneys or the attorney general, from analyzing whether the public is the real party in interest and dismissing lawsuits for lack of standing when the public is not the real party in interest. See *People ex rel. Moloney v. General Electric Ry. Co.*, 172 Ill. 129 (1898) (the attorney general was found not to have standing where the attorney general's suit did not involve public rights and the real parties in interest were rival railroad companies); *People ex rel. Courtney v. Wilson*, 327 Ill. App. 231, 243 (1945) (noting that this court has dismissed cases brought by the public's authorized representatives "where it has appeared that the real party in interest is some individual seeking to further a personal cause"). Here, there is no question that the public is the real party in interest when the issue before us is whether the legislature has impermissibly nullified a constitutionally protected right that has the purpose of protecting the safety of crime victims and their families.

legislature may add to the powers of our state's attorneys (*Gaughan*, 2016 IL 120110, ¶ 32) and has done so, as stated above, in the Counties Code and the Crime Victims Act. However, their powers are broader than and not limited to those granted by the legislature. A state's attorney has constitutional powers *vis-à-vis* the attorney general with respect to matters of public interest, and this distinguishes the standing analysis in the present case from the standing analysis of litigants lacking similar powers derived from the constitution, statutes, and the common law. The cases cited by defendants on the issue of an individual citizen's standing to bring suit or raise a constitutional challenge have no relevance in this appeal.

¶ 101    We have previously stated that "the Attorney General is the sole officer authorized to represent the People of this State in any litigation in which the People of the State are the real party in interest." *People ex rel. Scott v. Briceland*, 65 Ill. 2d 485, 500 (1976). However, this principle has never been raised to defeat a state's attorney's standing to do so as well. Instead, we have clarified that this "generic statement" was rendered in a different context and is not dispositive with respect to the powers and duties of state's attorneys. *Gaughan*, 2016 IL 120110, ¶ 24.

¶ 102    Although the Attorney General, in the present case, has taken a position contrary to that of the state's attorneys, this dispute between the constitutional officeholders does not defeat the state's attorneys' standing to bring their claims, contrary to the positions taken by the Attorney General. Our state's attorneys and the Attorney General hold concurrent constitutional authority to represent the interests of the public, and they may exercise their authority in an independent and autonomous manner, at their discretion and as held accountable by the public during elections, not by the courts under the standing doctrine.

¶ 103    In *People v. Walker*, 119 Ill. 2d 465, 472-73 (1988), in an appeal as of right to this court, the state's attorney took the position that the circuit court properly found that a statutory provision was unconstitutional, while the attorney general was permitted to file an *amicus* brief disagreeing with the state's attorney and asking this court to reverse the circuit court's ruling that invalidated the provision.

¶ 104    Likewise, in *Gaughan*, while discussing the powers of state's attorneys, we cited *People ex rel. Alvarez v. Howard*, 2016 IL 120729, noting, with approval, as follows: "Attorney General appears on behalf of, and supports the legal position taken by, [the] circuit judge *but does not dispute State's Attorney's right or standing*

*to bring a mandamus action in a proper case for fully presenting alternative views for judicial determination*." (Emphasis added.) *Gaughan*, 2016 IL 120110, ¶ 32 n.5. Here, the state's attorneys' powers derived from the Illinois Constitution afford them standing to challenge the constitutionality of the pretrial release provisions of the Act and offer views different than those of the Attorney General in this dispute.[7] We have no judicial authority to nullify this constitutional power.

¶ 105                       C. This Court's Power to *Sua Sponte* Consider the
                            Constitutionality of a Statute

¶ 106        Standing aside, the fact remains that plaintiffs' lawsuit presents us with an actual controversy in which defendants have conceded justiciability and over which we have jurisdiction. This is undisputed. We have previously stated that "[i]t is hornbook law that an unconstitutional statute is void." *In re Contest of the Election for the Offices of Governor & Lieutenant Governor Held at the General Election on November 2, 1982*, 93 Ill. 2d 463, 471 (1983); *People ex rel. Peoria Civic Center Authority v. Vonachen*, 62 Ill. 2d 179, 181 (1975) (this court on its own initiative considered a constitutional question not raised by the parties and held the governing statute unconstitutional). Therefore, in this case, we may even exercise our power to *sua sponte* consider the constitutionality of the statute before us. See *In re Contest of the Election for the Offices of Governor & Lieutenant Governor Held at the General Election on November 2, 1982*, 93 Ill. 2d at 470-71 (this court considered the constitutionality of the statute involved in the dispute "in view of the nature of the proceedings and *the public interest involved*," although none of the parties raised the issue (emphasis added)); see also *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 523 (1990) ("Although the Attorney General questions the standing of the *amicus* to raise the constitutional

---

[7]Other states that have addressed the authority of the attorney general or prosecuting attorney to challenge the constitutionality of a state statute have reached conflicting conclusions. *State v. Chastain*, 871 S.W.2d 661, 662-63 (Tenn. 1994) (identifying cases from different jurisdictions). However, the majority of reported decisions from our sister states uphold the authority of an attorney general or prosecuting attorney to challenge the constitutionality of a statute by reference to traditional concepts of standing. *Id.* at 662-65 (discussing cases). In *Chastain*, the Supreme Court of Tennessee held that prosecuting attorneys (the district attorneys general) "should also be allowed to challenge the constitutionality of statutes" under the same avenues available to the Tennessee attorney general. *Id.* at 665.

issue, we note that even had the issue not been raised by one of the respondents, our court may consider the constitutionality of a statute *sua sponte*.").[8] Defendants' challenge to plaintiffs' standing does not prevent us from considering the constitutionality of the pretrial provisions of the Act in this justiciable controversy.

¶ 107                           D. Standing of the Sheriffs

¶ 108        Because the state's attorneys who have brought this suit have standing to challenge the pretrial provisions of the Act by invoking the constitutional rights set out in the crime victims' rights provision in the Illinois Constitution, there is no need to determine whether sheriffs also have standing to raise any challenges to the statute. *People ex rel. Wofford v. Brown*, 2017 IL App (1st) 161118, ¶ 24 ("[B]ecause we find plaintiff-appellant has standing as a sitting alderman of the City, we need not determine whether either Mr. Wofford or Mr. Nesbit also have standing.").

¶ 109              II. The Vested Constitutional Rights of Crime Victims
                 Set Out in the Illinois Constitution's Bill of Rights

¶ 110        Turning to the merits of plaintiffs' constitutional challenges, my analysis begins and ends with the enumerated rights of crime victims set out in article I, section 8.1, of the Illinois Constitution. Ill. Const. 1970, art I, § 8.1. The constitutional rights of crime victims set out in our constitution's bill of rights include, among other rights, *"[t]he right to have the safety of the victim and the victim's family considered in denying or fixing the amount of bail ***."* (Emphasis added.) *Id.* art. I, § 8.1(a)(9). The pretrial release provisions of the Act effectively nullify this right, and in doing so, the legislature has impermissibly usurped the ultimate sovereign power in this state, *i.e.*, the citizens.

---

[8] It would be improper for this court to *sua sponte* consider whether a statute is unconstitutionally applied without the necessary factual findings to conduct such analysis. *People v. Mosley*, 2015 IL 115872, ¶ 47. The present case, however, concerns whether the statute is unconstitutional on its face, which is purely a question of law. *Oswald v. Hamer*, 2016 IL App (1st) 152691, ¶ 3.

¶ 111                    A. This State's Ultimate Sovereign Power Is
                         Vested With the Citizens of Illinois

¶ 112        The majority correctly explains, and I agree, that we may not declare a statute to be unconstitutional on any basis that is "not prohibited by the constitution and within the legislative discretion." *People ex rel. Mooney v. Hutchinson*, 172 Ill. 486, 495 (1898); *Droste v. Kerner*, 34 Ill. 2d 495, 498-99 (1966) (the General Assembly basically may enact any law, provided it is not inhibited by some constitutional provisions). A constitutional challenge to a statute begins with a strong presumption of validity because the legislature is principally responsible for determining the public policy of our state. *Lebron*, 237 Ill. 2d at 260 ("Because the formulation and implementation of public policy are principally legislative functions, the courts afford substantial deference to legislative enactments.").

¶ 113        Although the legislature's enactments are shrouded with a strong presumption of constitutionality, this presumption is not authority for Illinois courts to disregard vested constitutional rights impaired by legislative action. We have repeatedly held that "the General Assembly cannot enact legislation that conflicts with provisions of the constitution unless the constitution specifically grants it such authority." *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 81. This is true because the ultimate sovereign authority of our state lies with its people who can withhold or entrust government powers with such limitations as they choose. *Hawthorn v. People*, 109 Ill. 302, 305-06 (1883). Importantly, "[t]he people of Illinois give voice to their sovereign authority through the Illinois Constitution," which is where they "decree[ ] how their sovereign power may be exercised, by whom and under what conditions or restrictions." *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 79. "Where rights have been conferred and limits on governmental action have been defined by the people through the constitution, the legislature cannot enact legislation in contravention of those rights and restrictions." *Id.* The legislature is prohibited from exceeding "the bounds imposed by the constitution or, through legislative decree, seek[ing] to alter them." *Id.* ¶ 80.

¶ 114        Regardless of whether the public policy underlying the abolishment of monetary bail is sound, we cannot "sustain a law where there is a want of power to enact it, merely because it is wise in policy or just in its provisions." *Hutchinson*, 172 Ill. at 495-96. If a statute is unconstitutional, we are obligated to declare it

invalid no matter how desirable or beneficial the legislation may be. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 378 (1997). We have this obligation because our constitution "is supreme, and whatever the purpose of the people may have been in imposing a restriction upon legislation it must be obeyed." *Sutter v. People's Gas Light & Coke Co.*, 284 Ill. 634, 641 (1918); *People v. Gersch*, 135 Ill. 2d 384, 398 (1990) ("In cases where we determine that a statute is repugnant to the Constitution, our duty to declare the law void, in order to protect the rights which that document guarantees, is a paramount and constitutionally mandated function of our court system."). In addition, our duty to declare an unconstitutional statute invalid cannot be evaded nor negated by "dire consequences" that may follow if the statute is held unconstitutional. *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 190 (1952).

¶ 115    Accordingly, this court's task in this appeal is strictly an exercise in ensuring that the legislature has not exceeded the bounds of its power as limited by Illinois citizens in their constitution. The individual rights vested in the Illinois Constitution's bill of rights are not subordinate to legislative power; the opposite is true. Therefore, in exercising our judicial power, this court may not alter or ignore the plain language of our constitution as set out by the citizens, no matter how strongly the court agrees with the public policy underlying the abolishment of monetary bail. The majority's analysis, however, does just that.

¶ 116    Our constitution gives crime victims a constitutionally protected "right" to have their safety, and the safety of their family, considered in denying or fixing the amount of bail. We have previously emphasized that the crime victims' rights provision in the Illinois Constitution is part of our constitution's "bill of rights" and that, "[w]here any act of the legislature *** tends to infringe upon the rights thus preserved, *we must assume that it was the intent of the framers thereof that there should be no curtailment of such rights*." (Emphasis added.) *People v. Richardson*, 196 Ill. 2d 225, 231 (quoting *People ex rel. Wellman v. Washburn*, 410 Ill. 322, 328-29 (1951)). It has been a long-standing principle in this state that the legislature has no power to impair or infringe upon rights vested in our state constitution. *City of Chicago v. Ward*, 169 Ill. 392, 412 (1897). Under the pretrial release provisions of the Act, however, there is no set of circumstances in which the safety of crime victims and their families can be considered in setting the amount of bail; the amount of bail is effectively set at zero for all cases under the Act. The pretrial release provisions of the Act, therefore, infringe on a constitutionally protected

right to such an extent that the right is wholly nullified. See Pub. Act 101-652, § 10-255 (eff. Jan. 1, 2023) (adding 725 ILCS 5/110-1.5) ("the requirement of posting monetary bail is abolished").

¶ 117    The citizens of Illinois created this constitutional right in 2014 when they adopted the proposed amendment to the constitution by referendum during the 2014 general election, by an overwhelming majority of the voters. See Ill. State Bd. of Elections, Official Canvass, November 4, 2014 General Election, at 4 (Nov. 2014), available at https://www.elections.il.gov/electionoperations/DownloadVote Totals.aspx [https://perma.cc/24PH-X2YL] (reflecting that more than 78% of votes cast on this question were for it). The drafters of this constitutional amendment are presumed to have acted with full knowledge of existing statutory law and the public policy of this state when this amendment was proposed to the voters in 2014. See *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago*, 2018 IL 122793, ¶ 30.

¶ 118                          B. Determining the "Amount" of
                               Bail in 2014 and Decades Prior

¶ 119    Beginning in 1963 and continuing for decades leading up to the 2014 adoption of the constitutional right at issue, article 110 of the Code has set out detailed standards and procedures that Illinois courts utilize in determining how and when an accused can be detained in custody or should be released from custody prior to trial. See Ill. Rev. Stat. 1965, ch. 38, § 110-1 *et seq.* The Code expressly referred to setting an "amount" of monetary bail as the primary means for a defendant to secure pretrial release in this state.

¶ 120    The origins of article 110 of the Code derive from legislation passed in 1963 in which the legislature revised Illinois's bail system to "restrict the activities of professional bail bondsmen and to reduce the cost of liberty to arrested persons awaiting trial." Ill. Ann. Stat., ch. 38, art. 110, Committee Comments-1963, at 273 (Smith-Hurd 1980); see *People v. Woodard*, 175 Ill. 2d 435, 445 (1997) ("[W]hen enacting article 110 of the Code of Criminal Procedure in 1963, [the legislature] was concerned with inequities posed by the administration of bail in criminal cases."). The legislature effectively eliminated the use of professional "bail bondsmen" by adding section 110-7(a) to the Code, which required courts to release

defendants upon a deposit of 10% of any monetary bail required. 1963 Ill. Laws 2836 (§ 110-7(a)); *Schilb v. Kuebel*, 404 U.S. 357, 360 (1971) (noting that the bail bondsman abruptly disappeared in Illinois due primarily to the success of the 10% bail deposit provision).

¶ 121    Effective January 1, 1964, section 110-7(a) of the Code provided, "The person for whom bail has been set shall execute the bail bond and deposit with the clerk of the court before which the proceeding is pending a sum of money equal to 10% of the bail." 1963 Ill. Laws 2836 (§ 110-7(a)) (adding Ill. Rev. Stat. ch. 38, § 110-7(a)); *People v. Bruce*, 75 Ill. App. 3d 1042, 1046 (1979) ("The Committee Comments to section 110-7 state that the section 'is new and provides the procedure for depositing ten per cent of the amount of bail as security for appearance. ***' [Citation.]").

¶ 122    Article 110 of the Code also provided that courts shall determine an "*amount of bail*" that is (1) sufficient to assure the accused's compliance with the conditions set forth in the bail bond, (2) not oppressive, (3) commensurate with the nature of the offense charged, (4) considerate of past criminal acts and conduct of the defendant, and (5) *considerate of the financial ability of the accused*. Ill. Rev. Stat. 1965, ch. 38, § 110-5(a). (Emphasis added.)

¶ 123    Since the 1963 codification of article 110 of the Code and leading up to the 2014 amendment to our constitution, the legislature has revised article 110 of the Code numerous times. Throughout this period the legislature maintained the practice of defendants posting *monetary* bail to secure their pretrial release and maintained the circuit court's corresponding duty to exercise its discretion in determining the "amount of bail," specifically in reference to monetary bail. Depositing 10% of the monetary bail amount by the accused was "designed as the principal method to be used in giving bail." *Schilb v. Kuebel*, 46 Ill. 2d 538, 546 (1970). This was Illinois's public policy when the citizens amended the constitution, vesting crime victims with a constitutionally protected right in this very process of determining the amount of monetary bail.

¶ 124    C. The Plain Language of the Victims' Rights Clause

¶ 125    When the plain language of the vested right is considered in light of our state's public policy that existed at the time the voters vested this right, it is plainly evident that the people's intent in amending the constitution was to decree that, as a matter of public policy in this state, the determination of the *amount of* monetary bail, as was set out in article 110 of the Code, is a judicial process that furthers the interests of the safety of crime victims and their families and is worthy of constitutional protection. This court must give deference to the public's wisdom in adopting this constitutional amendment with the same vigor, if not greater, as the majority gives to the legislature's wisdom in passing the pretrial release provisions of the Act.

¶ 126    Whether fixing an amount of monetary bail effectively furthers the safety interests of crime victims and their families and whether alternative means better serve this purpose are *not* questions that we are empowered to answer in analyzing the constitutionality of the pretrial release provisions of the Act. Like the public policy underlying legislation, we are not authorized to second-guess the citizens' wisdom in making public policy determinations when they amend the constitution. The ultimate sovereign authority of our state, its people, can define constitutional rights as they choose and limit government powers in doing so. *Hawthorn*, 109 Ill. at 305-06.

¶ 127    The majority alters the scope of this vested constitutional right with the following strained logic: "The word 'amount' connotes quantity and does not only mean a quantity of money but rather, consonant with the bail clause, a quantity of sufficient sureties." *Supra* ¶ 39. The majority's assertion that the word "amount" does not pertain to monetary amount does not stand up to any meaningful scrutiny under constitutional jurisprudence.

¶ 128    For example, in *Carmichael*, 2018 IL 122793, we addressed the constitutionality of statutory amendments passed by our legislature that eliminated union service credit for leaves of absence for participants in public pension funds. We held that the statutory amendments violated the express language of the pension protection clause of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5). *Carmichael*, 2018 IL 122793, ¶ 32. In *Carmichael*, the State advanced an argument similar to defendants' argument in the present case, and this court outright rejected that argument as being "manifestly inaccurate." *Id.* ¶ 30.

¶ 129     In *Carmichael*, in defense of the unconstitutional legislation, the State argued that the delegates and voters did not intend that the benefit that was eliminated by the legislature would be protected by the constitution's pension clause. *Id.* In the present case, defendants, likewise, argue that the drafters and voters did not intend for crime victims to have constitutional protection in setting an amount of monetary bail. In *Carmichael*, this court rejected the argument as "pure speculation" and being "manifestly inaccurate" (*id.*), and we should do so in this case as well.

¶ 130     The *Carmichael* court reasoned that

"the right to earn service credit on a leave of absence working for a teacher labor organization *was one of the retirement system benefits in the Pension Code for many years prior to and at the time the Illinois Constitution was debated by the drafters and then ratified by the voters* [citation]." (Emphasis added.) *Id.*

We concluded, therefore, that "it was the public policy of the State at the time our constitution was adopted to grant a path to such service credit as a benefit of participation in at least one of the public retirement systems." *Id.* We noted, "[s]imilar to a legislature that is presumed to act with knowledge of all prior legislation, *the drafters of the constitution are presumed to have acted with full knowledge of existing statutory law and the public policy of this state*. [Citation.]" (Emphasis added.) *Id.* In setting out a meaningful constitutional analysis of the issue, this court stated:

"If the drafters had intended to prevent any benefit related to service credit in connection with work done for a labor organization while on a leave of absence, they could have so specified, especially where union service credit was already part of the existing pension statute to some extent. But they did not. Rather, the drafters chose 'expansive language' that broadly defines the range of benefits encompassed." *Id.*

¶ 131     This constitutional analysis applies with equal force in the present case. As explained above, since 1963, article 110 of the Code provided for a procedure involving the circuit court's exercise of discretion in determining an amount of monetary bail. Like the union service credits at issue in *Carmichael*, the practice of setting an "amount" of monetary bail was firmly rooted as part of the Code for

many years prior to and at the time the people vested this constitutionally protected right, defining the constitutional right in terms of "amount of bail." The drafters of the crime victims' rights clause are presumed to have acted with full knowledge of existing statutory law and the public policy of this state. *Id.* In 2014, the judicial act of setting the "amount of bail" in this state, unquestionably, referred to monetary bail.

¶ 132    If the drafters and voters did not believe that fixing an "amount" of monetary bail serves the interest of safety of crime victims and their families and, therefore, should not be constitutionally protected, they would not have agreed to include that specific language in defining the right. The plain language the drafters used vests crime victims with the constitutionally protected right to have their safety and the safety of their family considered "in denying or fixing the amount of bail *** *and* setting conditions of release after arrest and conviction." (Emphasis added.) Ill. Const. 1970, art. I, § 8.1(a)(9). Similar to what this court stated in *Carmichael*, if the drafters intended for the right to mean what the majority suggests, the drafters would have defined the right in more general terms, defining the right to having crime victims' safety considered merely in "setting conditions of release after arrest," *i.e.*, other sureties. The right is not defined in these terms as the majority suggests. Instead, the drafters used specific language, constitutionally binding the safety of victims and their families with the judicial act of setting the "amount of bail." If our constitution has any meaning, the constitutional bond between these two policies simply cannot be severed by legislative decree or judicial fiat. The constitutional bond can be broken only by the same method that it was created.

¶ 133    In addition, the majority's construction of the crime victims' rights clause impermissibly reduces the phrase "in denying or fixing the amount of bail" to meaningless surplusage. See *Coalition for Political Honesty v. State Board of Elections*, 65 Ill. 2d 453, 466 (1976) ("The drafters of the Constitution, if the defendants' construction of the section were adopted, would have unnecessarily used the words 'structural and procedural,' ***. *** However, *the language of the drafters cannot be so facilely disregarded*." (Emphasis added.)).

¶ 134    The majority compounds its flawed construction with the untenable assertion, "[t]o the extent that 'amount' may imply an amount of money, the crime victims' rights clause simply reflected the reality of Illinois's bail system at the time it was

adopted. *That reality has changed.*" (Emphasis added.) *Supra* ¶ 39 n.2. This court cannot ignore portions of the express language used to define the right, making it mean less than what it plainly states. The majority's suggestion otherwise upends the constitutional foundation of this state.

¶ 135    The abolishment of monetary bail may promote the public-policy goal of greater fairness in the pretrial release process; however, we cannot ignore the Act's infringement on the plain language of our constitution even when unwise results may follow. See *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 30 ("It is for the voters to decide whether a proposed constitutional amendment is wise or workable ***."); 16 Am. Jur. 2d *Constitutional Law* § 65 (May 2023 Update) ("The aim of judicial construction" is "not to delete sections from the constitution on the theory that if conditions had been different, they would not have been written," and "the duty of the judiciary is merely to carry out the provisions of the plain language stated in the constitution."). The remedy for an unwise or outdated constitutional right is to seek a constitutional amendment, not to force a legislative or judicial annulment.

¶ 136    The majority supports its conclusion in this case with the assertion that the adoption of this constitutional amendment in 2014 did not enact sweeping changes to the criminal justice system. However, giving effect to the plain language of the crime victims' rights clause requires no such conclusion. As explained above, determining "amount of bail" had been firmly rooted in article 110 of the Code since article 110's adoption decades prior to this constitutional amendment. The constitutional amendment did not enact sweeping changes to this practice, but what it did do was endow crime victims with an explicitly defined constitutionally protected right in the process of determining the amount of bail, a right that was not constitutionally protected prior to the adoption of the 2014 constitutional amendment. By amending the constitution, the citizens, in the exercise of their wisdom, deemed the safety of crime victims and their families worthy of constitutional protection in the bail process that was set out in article 110 of the Code at the time the right was created.

¶ 137    Therefore, by creating a constitutionally protected right of crime victims in setting the "amount of bail," the citizens of Illinois expanded the public policy purpose of determining an amount of monetary bail to include the stated goal of

furthering the safety of crime victims and their families. The people have the ultimate sovereign power of this state, and neither the legislature nor the judiciary has the power to invalidate their constitutional amendment by second-guessing the wisdom in how they exercise their sovereign authority.

¶ 138　　By amending the constitution in 2014, the citizens decreed how their sovereign power may be exercised with respect to bail and under what conditions and restrictions. Until the citizens amend our state constitution, the safety of crime victims and their families *must* be considered in setting the *amount* of bail. The pretrial release provisions of the Act wholly nullify this constitutional right by mandating that the *amount* of bail in every criminal case be *zero* with no consideration of the safety of crime victims and their families. Accordingly, regardless of whether the abolishment of monetary bail might result in greater fairness in the pretrial release process, in passing the pretrial provisions of the Act, the legislature overstepped constitutional bounds by infringing on a constitutionally protected right that is set out in our constitution's bill of rights. As a result, we are obligated to declare the pretrial release provisions of the Act constitutionally invalid.

¶ 139　　　　　　　　　　　　III. CONCLUSION

¶ 140　　"In a representative government, such as we enjoy in Illinois, all powers of government belong ultimately to the people in their sovereign corporate capacity. Under such a government the people may distribute, for the purposes of government, the various powers thereof." *People ex rel. Elliott v. Covelli*, 415 Ill. 79, 88 (1953). This court underscored this truth more than 195 years ago in an opinion published in the very first volume of our official reports: " '[The Illinois Constitution] is the supreme, permanent and fixed will of the people in their original, unlimited and sovereign capacity, and in it are determined the condition, rights and duties of every individual of the community.' " *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 79 (quoting *Phoebe v. Jay*, 1 Ill. 268, 271 (1828)).

¶ 141　　The people of Illinois exercised their ultimate sovereign power in 2014 when they vested crime victims with constitutionally protected rights. They did so by amending the bill of rights in our state constitution, setting out specific enumerated rights to be enjoyed by all crime victims in this state. Those enumerated rights

- 42 -

include the explicitly defined right to have their safety and the safety of their families considered by the courts in "denying or fixing the amount of bail."

¶ 142     This constitutionally protected right is, without question, a limitation on the General Assembly's authority. Before the legislature can abolish monetary bail, effectively requiring the "amount" of bail to be zero for every criminal proceeding in this state, the legislature must first ask the people to again exercise their ultimate sovereign power and reconsider the scope of this constitutionally protected right. Until that has occurred, the legislature may not, under any circumstances, usurp the people's exercise of their ultimate sovereign power and undermine their embodiment of this right as cemented in the bill of rights of our constitution.

¶ 143     When the state of New Jersey overhauled its pretrial release practices to prioritize nonmonetary means of pretrial release, it amended its constitution to accommodate this fundamental change in that state's public policy. See *Holland v. Rosen*, 895 F.3d 272, 279-80 (3d Cir. 2018) (noting that both the new legislation and the constitutional amendment took effect on January 1, 2017). Here, in Illinois, to abolish monetary bail and the corresponding judicial determination of the "amount of bail," the legislature must, likewise, first ask the citizens of this state to reconsider the constitutional mandate that the safety of crime victims and their families be considered in setting the amount of bail. The legislature has not done so, but this is constitutionally required no matter how desirable it may be to abolish monetary bail. Accordingly, in the interests of preserving our representative form of government, this court is obligated to declare the Act's infringement on the Illinois Constitution's bill of rights to be invalid and unenforceable. For these reasons, I am compelled to dissent from the majority's validation of this unconstitutional statute.

¶ 144     JUSTICE HOLDER WHITE joins in this dissent.