2024 IL App (1st) 240653-U

No. 1-24-0653B

Order filed June 27, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 23 CR 5937 |
| vs. | ) ) | |
| FRANKLIN MCKELKER, | ) ) | Honorable Tiana S. Blakely, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford concurred in the judgment.
Justice Ocasio specially concurred.

**ORDER**

¶ 1        *Held*:   We affirm the circuit court's order where the evidence demonstrated that McKelker's continued detention was necessary to avoid a real and present threat to the safety of any person(s) or the community, based on the specific articulable facts of the case.

¶ 2        Defendant Franklin McKelker appeals the circuit court's order granting the State's petition for pretrial detention, pursuant to Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023). McKelker was arrested and charged prior to the effective date of Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act

(Act).[1] For the following reasons, we affirm.

### I. BACKGROUND

McKelker was arrested on May 3, 2023 and was charged with a combined 26 counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2), (a)(4) (West 2022)), criminal sexual assault (702 ILCS 5/11-1.2(a)(1), (a)(3) (West 2022)), and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6), (b), (c)(1)(ii), (d) (West 2022)), following a July 4, 2022 incident in which he sexually assaulted his 13-year-old sister-in-law, A.G.[2] He was ordered held no bail and remained in custody.

On March 5, 2024, McKelker filed a petition requesting that the court grant him pretrial release under the Act. A week later, the State filed a responsive verified petition to deny pretrial release, pursuant to sections 5/110-2 and 5/110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-2, 110-6.1 (West 2022)).

The State's petition alleged that McKelker committed an eligible offense (aggravated criminal sexual assault) as listed in Section 5/110-6.1(a)(1.5) of the Code, and that he "poses a real and present threat to the safety of any person or persons in the community." Specifically, the State relayed that:

> "The victim and [McKelker] have known each other since the victim was born, and the victim refers to [McKelker] as "Dad." At the time of this incident, the victim was a 13-year-old girl, and [McKelker] was a 31-year-old man. On or about July 4, 2022, the victim had spent the day with [McKelker] and her sister to celebrate the Fourth of July holiday.

---

[1] "The Act has also sometimes been referred to in the press as the Pretrial Fairness Act. Neither name is official, as neither appears in the Illinois Compiled Statutes or public act." *Rowe v. Raoul*, 2023 IL 129248, ¶ 4 n. 1. *Raoul* lifted the stay of pretrial release provisions and set an effective date of September 18, 2023. *Id.* ¶ 52; Pub. Acts 101-652, § 10-255, 102  1104, § 70 (eff. Jan. 1, 2023).

[2] McKelker is married to A.G.'s sister and A.G. refers to McKelker as "Dad." We refer to the victim by her initials to maintain her anonymity.

When they returned home, the victim and [McKelker] were sitting in the front room on the main floor of the house. [McKelker] and victim were watching television and cuddling on the couch. While on the couch, the victim began to feel itchy and so she removed her leggings but kept on her underwear. [McKelker] went downstairs to get some lotion and returned to the couch with it and began to apply lotion to the victim's legs. [McKelker] continued to rub the victim's legs and moved his hand up to the victim's inner thigh, near her sex organ, and made the victim uncomfortable. [McKelker] then rubbed the victim's sex organ with his hand over the victim's underwear. [McKelker] used two fingers to then rub the victim's sex organ underneath the victim's underwear and then tried to insert his fingers into the victim's sex organ. At the same time, he was trying to penetrate the victim's sex organ with his fingers, [McKelker] was also biting the victim's neck while commenting about how the victim was tight. Every time someone would walk into the front room, [McKelker] would stop what he was doing. The victim's older sister, and [McKelker]'s wife, walked into that room at one point but did not observe anything out of the ordinary and left the room. After the older sister left, [McKelker] put his hands in the victim's underwear and tried to touch the victim's chest, but [McKelker] was unable to make contact with the victim's skin because she was wearing a bra. [McKelker] eventually stopped when the victim made something fall on the floor and then acted like she'd left her phone in her purse. The victim told [McKelker] she was going to bed and then went upstairs to her bedroom, but [McKelker] followed her to her room.

[McKelker] then acted like he was tucking the victim into bed, but then [McKelker] began throwing the blankets to the side. He then grabbed the victim's leg and moved it to the side. [McKelker] touched the victim's chest and put his hand on the victim's sex organ and began to rub the victim's sex organ underneath her underwear. The victim tried to say

3

something but couldn't get words out. But when the victim started making noise, [McKelker] covered the victim's mouth, and the victim felt trapped. The victim's sister then came upstairs to the main floor from the basement where she told the victim that she had to sleep downstairs in the victim's mother's room, and the victim went downstairs. While she was in her mom's room, [McKelker] came in to let the dog out. The victim was laying in her mother's bed, on her stomach, and [McKelker] laid down next to her and began rubbing her back and touching the victim's buttock over her underwear. [McKelker] turned the victim over and made the victim lay on her back where he then started touching her sex organ with his hand over the victim's underwear. [McKelker] got off the bed and grabbed the victim's legs where he then moved the victim closer to him. The victim was too shocked to say anything at that point. While at the side of the bed, [McKelker] removed the victim's underwear and began rubbing his fingers on the victim's sex organ. [McKelker] then flipped the victim over, so she was on her hands and knees and [McKelker] tried to insert his penis into the victim's sex organ but was unsuccessful. However, [McKelker] did not stop. He then flipped the victim over onto her back and after several more attempts, [McKelker] succeeded in penetrating the victim's sex organ with his penis. [McKelker] was not wearing a condom. The victim made noises during this time, and [McKelker] covered her mouth with his hand. The victim saw [McKelker] making facial expressions as if he was enjoying it and [McKelker] made comments as to the tightness and wetness of the victim's vagina. The victim felt pain from the penetration. Eventually, [McKelker] stopped and left the room.

The victim then went to the bathroom and felt a burning sensation. The victim returned to her room and called her friend, who was another 13-year-old girl and made disclosures. The victim then went to her brother, who was in his room with his girlfriend,

4

and made disclosures to her brother. The brother confronted [McKelker], who made denials, and the victim called her mother and made disclosures to her mother. The victim was then taken to the St. James Hospital where she underwent a sex assault kit with a SANE registered nurse. On or about December 12, 2022, the lab report for the sex assault kit was completed, and one of the vaginal swabs tested positive for male sperm DNA which eventually came back as [McKelker]'s DNA. The victim and her brother both positively identified [McKelker] through single photo identifications. In early November 2022, [McKelker] and witness Builta began working for the same company. Within the first week of working with [McKelker], [McKelker] made admissions to witness Builta. On or about May 3, 2023, [McKelker] turned himself in to the Flossmoor Police Department.

The release of [McKelker] would pose a real and present threat to the physical safety of any person or persons. In support therefore the following is submitted: [McKelker] assaulted the victim, who was a 13-year-old child, multiple times throughout the evening of July 4, 2022. Even when the victim managed to get away from [McKelker] and move to a separate room, [McKelker] followed her so that he would be able to continue his assaults. [McKelker] was not deterred from his multiple assaults of the victim by the presence of other family members in the home, nor was the fact that his own wife, the sister of the victim, entered the very room in which he was assaulting the victim enough to prevent [McKelker] from further assaulting the victim. [McKelker] caused the victim pain throughout his assault."

¶ 7 The court then conducted a hearing on the petitions. The State proceeded by presenting a proffer substantially identical to that in its petition.[3] The State represented that McKelker has no

---

[3]The State acknowledges that McKelker was incorrectly described as A.G.'s uncle in its petition for detention and at the hearing.

previous criminal history.

¶ 8        Defense counsel highlighted that McKelker's wife, A.G.'s sister, was present at every court date in support of him, as was his mother. Counsel further argued that McKelker's parents have lived in Homewood, Illinois for approximately 30 years and that their home was a possible place for McKelker to stay while on EM. He is a high school graduate who has worked multiple jobs throughout his adult life, including ten years as a chemical operations operator at a car paint manufacturing company. Additionally, he has a five-year-old daughter and has been involved in her life since birth. Counsel emphasized that McKelker became aware of the allegations against him on July 5, 2022 and he voluntarily removed himself from the home.[4] Counsel argued that McKelker's lack of criminal background demonstrated he is not a threat to the community. Further, counsel alleged that he was not a threat to A.G. because he removed himself from the home and had discontinued any communication with her. Last, counsel contended it was notable that the incident happened in July 2022, but McKelker remained out of custody until May of 2023 when police requested that he surrender himself. This indicates that McKelker is not a flight risk.

¶ 9        In response, the State countered that McKelker is a "very dangerous man who had unconsented sex with his own 13-year-old niece." Additionally, the State highlighted that McKelker confessed to a co-worker that "he put his penis into his 13-year-old niece's vagina." The State concluded that McKelker is "definitely a danger to any woman on this planet, including his own five-year-old daughter, because he can't control himself."

¶ 10        The court found the State proved by clear and convincing evidence that the proof is evident and the presumption great that McKelker committed aggravated criminal sexual assault, and that he poses a real and present threat to both A.G. and the community at large. Specifically, the court

---

[4]McKelker and A.G.'s sister were living in the same home as A.G. at the time.

stated that it believes, based on the proffered evidence, that McKelker is a threat to any minor, including his own child. The court noted that McKelker does not have any criminal history and surrendered to police, but addressed McKelker's dangerousness, highlighting that the offense was committed on the 4th of July at a familial holiday gathering. The court noted that A.G. was victimized by someone she trusted and loved. Further, the court addressed why it believed no conditions could mitigate the real and present threat McKelker poses, stating that EM was inappropriate where the proffered evidence indicated that he assaulted a 13-year-old child more than three times, following her through various rooms, with other adults present. The court additionally explained that placing McKelker on EM at his mother's home does not preclude the possibility, as one of seven children, that there would be another holiday gathering or that he would be exposed to another child in his mother's house. The court noted that GPS would not mitigate the threat, as it does not allow for his actions to be controlled and cannot ensure the safety of children. Last, the court explained that these are just allegations currently, but did note that the medical exam found McKelker's DNA in semen removed from a vaginal swab of the victim. Accordingly, the court ordered McKelker to remain remanded pending trial.

¶ 11     The court entered a written detention order using a template form that lists the requisite three propositions preprinted on the form—(1) the proof is evident or the presumption great that the defendant has committed a detention eligible offense, (2) the defendant poses a real and present threat to the safety of any person(s) or the community, based on the specific articulable facts of the case, and (3) no condition or combination of conditions of release can mitigate that threat. On lines provided below each proposition, the court wrote specific facts from the case that it relied upon to reach its findings. Beside the preprinted finding for the first proposition, the court wrote, "Agg. Crim. Sex. Ass." For the second proposition, the court wrote,

> "He sexually assaulted his 13 year old niece multiple times, following her from

room to room until he successfully penetrated her. He was relentless in his actions. He assaulted her while his wife was present in the home, as well as other adults. He is a threat to the victim and any minor children."

For the third proposition, the court wrote:

"[Electronic Home Monitoring (EM)] will not mitigate the threat to the safety of A.G. or any other minor in his presence. His wife walked in the very same room where he was assaulting A.G. and he continued the assault when his wife left. The presence of other adults in the home did not prevent [McKelker's] actions. This court finds neither will GPS or [EM]."

The order indicates that McKelker is to be detained pending trial.

¶ 12        McKelker filed a timely notice of appeal on March 21, 2024.

¶ 13                                II. ANALYSIS

¶ 14        On appeal, McKelker filed a notice in lieu of a memorandum, choosing instead to stand on the arguments he made in his notice of appeal. See Illinois Supreme Court Rule 604(h) (eff. Dec. 7, 2023). Utilizing the approved form from the Article VI Forms Appendix to the Illinois Supreme Court Rules (see Ill. S. Ct. Rs. Art. VI Forms Appendix R. 604(h)), McKelker's claims of error consisted of two claims: (1) the State failed to prove by clear and convincing evidence that he poses a real and present threat to the safety of any person(s) or the community, and (2) the State failed to prove by clear and convincing evidence that no condition or combination of conditions can mitigate the real and present threat he poses. More specific arguments were supplied in the blank spaces below these preprinted assertions.

¶ 15        As further support, McKelker argues that the State failed to meet its burden to prove that he poses a threat, where there were approximately 10 months between the offense date and the date that charges in this case were filed. He states that he and A.G. lived in the same home before

8

the allegations, and he immediately moved from that home and discontinued all communication with A.G. following the allegations. Further, McKelker points out that he voluntarily surrendered himself and has no prior arrest or criminal history. Next, he claims the State failed to prove that no conditions can mitigate any threat he may pose where he could be released on EM at his parent's residence in Homewood, Illinois. Additionally, he posits he could be placed on GPS and has no objection to a "No Contact Order" with A.G. or any place she may frequent. Last, he argues that no facts were presented indicating that lesser conditions are insufficient to ensure the safety of A.G., and there is no evidence that there is a *present* threat to the safety of any other person or the community.

¶ 16    The State chose to file a responsive memorandum, arguing that that the court properly exercised its discretion where they proved by clear and convincing evidence that McKelker poses a real and present threat to the safety of the community, and that no conditions could mitigate that risk. The State asserts that the court's finding that McKelker is dangerous was reasonable, based on the proffered evidence and statutory factors.

¶ 17    In considering this appeal, this court has reviewed the following documents which were submitted under Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023): (1) McKelker's notice of appeal pursuant to the Act, (2) the supporting record, and (3) the State's Response to McKelker's appeal.

¶ 18    "Pretrial release is governed by section 110 of the Code as amended by the Act." *People v. Morales*, 2023 IL App (2d) 230334, ¶ 4 (citing 725 ILCS 5/110-1 et seq. (West 2022)). Pursuant to the Code, "it is presumed that a defendant is entitled to release on personal recognizance on the condition that the defendant shall attend all required court proceedings and the defendant does not commit any criminal offense, and complies with all terms of pretrial release." 725 ILCS 5/110-2(a) (West 2022). Under the Code, all persons charged with an offense are eligible for pretrial release

before conviction. *Id.* The court may deny pretrial release only upon a verified petition by the State and following a hearing. 725 ILCS 5/110-6.1(a) (West 2022). It is the State's burden to prove by clear and convincing evidence that (1) the presumption is great or the proof evident that the defendant committed a detainable offense, (2) the defendant poses a real and present threat to the safety of any person(s) or the community, based on the specific and articulable facts of the case, and (3) no condition or combination of conditions can mitigate the threat the defendant poses, or prevent the defendant's willful flight from prosecution. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2022). The standard "requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 19 If the court determines that the State has met its burden and the defendant should be denied pretrial release, the court is required to make a written finding summarizing the reasons for denying pretrial release. *Id.* § 6.1(h)(1). If the court finds that detention is not appropriate, it can impose additional conditions if it determines such conditions:

> "are necessary to ensure the defendant's appearance in court, ensure the defendant does not commit any criminal offense, ensure the defendant complies with all conditions of pretrial release, prevent the defendant's unlawful interference with the orderly administration of justice, or ensure compliance with the rules and procedures of problem solving courts." 725 ILCS 5/110-10(b) (West 2022).

¶ 20 Section 110-7.5 of the Code provides guidance regarding individuals who were arrested prior to the effective date of the Act and separates those individuals into three categories. 725 ILCS 5/110-7.5 (West 2022). The first category is comprised of any defendant released subject to pretrial conditions prior to the Act's effective date. *Id.* § 110-7.5(a). The second category is comprised of any defendant remaining in pretrial detention after having been ordered released with pretrial conditions, including the condition of depositing monetary security. *Id.* § 110-7.5(b). Last, the

third category is comprised of "any person, not subject to subsection (b), who remains in pretrial detention and is eligible for detention under Section 110-6.1." *Id*.

¶ 21    McKelker falls into the third category, as an individual who was ordered held "no bail" prior to the Act's effective date. Section 5/110-7.5(b)(1) specifically states that such defendants "charged with offenses under paragraphs (1) through (7) of subsection (a) of Section 110-6.1 [shall be entitled to a hearing] within 90 days of the person's motion for reconsideration of pretrial release conditions." However, the statute does not specify what *type* of hearing such defendants are entitled to. While section 5/110-7.5(b) explains that the second category of defendants "shall be entitled to a hearing under subsection (e) of Section 110-5," the third category is specifically comprised of those defendants "not subject to subsection (b)," despite the third category itself being defined within subsection 5/110-7.5(b).

¶ 22    Although both parties and the trial court appeared to operate under the assumption that McKelker was entitled to a new detention hearing pursuant to section 5/110-6.1 of the Code, it would appear from the statute's plain language that it does not contemplate a new detention hearing for defendants such as McKelker—those arrested prior to the Act, who were previously detained by the court following a bond hearing. Instead, it appears that similarly situated defendants are entitled to a hearing to reconsider pretrial release conditions—a hearing more akin to that contemplated in section 5/110-5(e) of the Code. See *People v. Mansoori*, 2024 IL App (1st) 232351, ¶ 25 (holding that the only hearing referenced in subsection 110-7.5(b) is a subsection 110-5(e) hearing and noting that a hearing on pretrial detention for an individual the statute recognizes to be detained 'is nothing if not redundant."). Both McKelker and the State acknowledged that McKelker was previously ordered detained. Accordingly, the appropriate question before the court was whether continued detention was necessary "to avoid a real and present threat to the safety of any person or persons or the community, based on the specific

articulable facts of the case, or to prevent the defendant's willful flight from prosecution." 725 ILCS 5/110-6.5(i-5) (West 2022).

¶ 23    For detained defendants, "the Code does not require the court to again make specific findings that the State proved the three propositions by clear and convincing evidence as required at the initial hearing." *People v. Casey*, 2024 IL App (3d) 230568, ¶ 13. "Notably, this portion of the Code, unlike the portions dealing with petitions for detention, does not prescribe a quantum of evidence or place a burden of proof on any party." *Mansoori*, 2024 IL App (1st) 232351, ¶ 18. Further, subsection (i-5) requires the court to make the determination at each subsequent appearance. "This determination also does not contemplate the filing of a petition for detention." *Id*. Nonetheless, here the State filed a responsive detention petition after McKelker filed his petition for pretrial release, and the court proceeded as if it was an original detention hearing. We note that the State's apparent acquiescence to a section 110-6.1 detention hearing and the court's findings consistent with such a hearing did not render the proceeding a proper detention hearing. However, the required finding in section 110-6.1(i-5) shares some commonalities with the burden the State must meet at an initial detention hearing. *Mansoori*, 2024 IL App (1st) 232351, ¶ 33.

¶ 24    We now turn to the hearing that was held on March 11, 2024. Since the appellate court began deciding appeals pursuant to the Act, the court has consistently reviewed the trial court's pretrial release findings under either an abuse of discretion or a manifest weight of the evidence standard. See *People v. Morgan*, 2024 IL App (4th) 240103, ¶¶ 13-35 (thoroughly discussing the different standards of review as applicable to a decision under the Act). We need not opine on which of these two standards of review is proper, where the result of this case would be the same under either an abuse of discretion or manifest weight standard. We acknowledge that some justices have advocated for a *de novo* standard of review, however, no panel of the court has reviewed a pretrial release appeal utilizing *de novo* review.

¶ 25　　　Here, the evidence proffered demonstrated that McKelker's continued detention is necessary to avoid the real and present threat he poses. McKelker sexually assaulted his 13-year-old sister-in-law more than three times at a familial gathering. As she attempted to flee from McKelker, he followed her, moving from room to room and continuing his sexual assault. McKelker's DNA was found in semen recovered from a vaginal swab of the victim. The court noted McKelker was someone the victim trusted and loved and that she referred to McKelker as "dad." During the course of the assault, McKelker's wife—also the victim's sister—entered the room; even this was not enough to make McKelker stop his assault. The presence of multiple adults in the family home did nothing to deter McKelker as he pursued the victim throughout the house. The court specifically found that McKelker is a danger to not only the victim, but to his own biological five-year-old daughter, as well as any other child he may encounter. Moreover, while defense counsel argued that McKelker could be put on EM and reside at his mother's home, the court made it clear that, based on the articulable facts of the case, the presence of family was not enough to deter McKelker's actions. Further, the court found that no restriction it could impose would have any effect on whether McKelker would encounter children at his mother's house, and neither EM nor GPS could protect any children McKelker might be around. We find the facts proffered in this case support the court's decision to deny McKelker's motion and its conclusion that continued detention was necessary. Based on the foregoing, we cannot say that the court's decision is unreasonable, arbitrary, or not based on the evidence presented.

¶ 26　　　　　　　　　　　　　　III. CONCLUSION

¶ 27　　　Following a thorough review of the record on appeal, for the reasons stated, the circuit court's order is affirmed.

¶ 28　　　Affirmed.

¶ 29　　　JUSTICE OCASIO, specially concurring:

13

¶ 30      I concur in the judgment, but I respectfully disagree regarding the standard of review. I continue to hold the conviction that, except for findings of historical fact, the standard of review in appeals from detention orders should be *de novo.* See *People v. Whitaker,* 2024 IL App (1st) 232009, ¶¶ 79-138. (Ellis, J. concurring).