NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241527-U

NO. 4-24-1527

IN THE APPELLATE COURT

FILED
March 13, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Fulton County |
| JESSE POST, | ) | No. 23CF235 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas B. Ewing, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's order denying defendant pretrial release, finding (1) no error when the trial court considered hearsay evidence during the detention hearing and (2) the State proved by clear and convincing evidence there was no less restrictive means of protecting the victims or the community from the threat posed by defendant; therefore, the decision to deny defendant pretrial release was not against the manifest weight of the evidence.

¶ 2    Defendant, Jesse Post, appeals the trial court's order, entered November 26, 2024, denying his pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-1 *et seq.* (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (setting the Act's effective date as September 18, 2023). In accordance with Illinois Supreme Court Rule 604(h)(7) (eff. Apr. 15, 2024), defendant relies on his motion for

relief filed in the trial court as his argument on appeal. In his motion for relief, defendant argues the court erred in considering certain hearsay evidence regarding his dangerousness and the court's decision to deny him pretrial release was against the manifest weight of the evidence because the State failed to prove there is no less restrictive means of protecting the community from the threat he may pose. For the following reasons, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4            On November 7, 2023, defendant was charged by information with three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)). According to the information, from January 1, 2020, through May 28, 2020, defendant, who was over 17 years of age, committed specific acts of sexual contact with C.W., F.W., and E.W., who were all under 13 years of age at the time, for the purpose of his sexual gratification or arousal. A warrant was issued on November 7, 2023, ordering defendant to be arrested and held for a hearing without pretrial release. The warrant further ordered that he refrain from contact or communication with the alleged victims. Defendant was arrested on May 24, 2024.

¶ 5            On May 28, 2024, the State filed a verified petition to deny defendant pretrial release, alleging he was charged with a sex offense enumerated in the Code and his pretrial release posed a real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case. See 725 ILCS 5/110-6.1(a)(5) (West 2022). A hearing was held on the petition that same day, after which the trial court denied defendant pretrial release. Defendant's motion for relief pursuant to Rule 604(h)(2) was denied, and he filed a timely appeal. Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024).

¶ 6            On appeal, this court determined the trial court failed to make a record adequate to allow a meaningful review of its decision to deny defendant pretrial release. Therefore, we

vacated the order denying defendant's pretrial release and remanded with directions for the trial court to promptly set a new detention hearing, at which the State could present evidence and the court could make express findings, based on defendant's individual circumstances, as to whether any condition or combination of conditions would allow for his pretrial release. *People v. Post*, 2024 IL App (4th) 241002-U, ¶ 29 (DeArmond, J., dissenting).

¶ 7                    A. New Pretrial Detention Hearing on Remand

¶ 8            After the case was remanded, the trial court held a new detention hearing on November 13, 2024. When discussing with the parties how to proceed, the court stated, "I think it's important to reconsider that evidence [from the original hearing], if there is additional evidence also to present that, so that we can have a full understanding of the circumstances that apply here." Because the court expressly stated it had the transcripts of the original detention hearing and was familiar with the proffers made at that time, we incorporate by reference our summary of the facts in our prior decision in this case. *Id.* ¶¶ 4-11.

¶ 9                            1. *The State's Evidence*

¶ 10                    a. Proffer of Sheriff Jonathon Webb's Testimony

¶ 11            The State proffered Jonathon Webb, who was an investigator with the Fulton County Sheriff's Office (and is now the Fulton County sheriff), would testify to the following facts about a prior, unrelated investigation regarding defendant. Sheriff Webb interviewed defendant on September 22, 2017, regarding a complaint made by defendant's four-year-old daughter, L.G. (born October 2012). That same day, Sheriff Webb had been present during a forensic interview of L.G. with the Children's Advocacy Centers of Illinois (CAC). The interview was conducted by Phyllis Todd of the Fulton-Mason Crisis Service. Sheriff Webb would testify that L.G. said defendant "licked her butt on at least one occasion." The State

explained L.G. told Todd, " 'One time Daddy—who is the defendant in this case—took me in the woods' " to retrieve a frisbee because "her father had thrown [it] too far." L.G. said, " '[Defendant] peed with me' " and then " 'he licked my butt.' " L.G. identified body parts on a diagram during the interview, identifying the "buttocks as the butt" and "referred to both the vagina and penis as dooder." Defendant denied these allegations during his interview with Sheriff Webb.

¶ 12                    b. Proffer of Officer Ryan McCabe's Testimony

¶ 13        The State proffered Officer Ryan McCabe of the Canton Police Department would testify to the following facts regarding the allegations in this case.

¶ 14        Officer McCabe spoke with Breitanyia L., the mother of the three victims, about a criminal sexual assault complaint made approximately three years ago. Officer McCabe would testify Breitanyia reported that E.W., her seven-year-old son (born March 2016), made "statements regarding a sexual assault that happened to him in Canton." Breitanyia initially reported the incident to the Peoria Police Department and was then told to contact the Canton Police Department. Breitanyia told Officer McCabe the incident was investigated, but E.W. was not interviewed because he was "too young at the time." The other two victims, F.W. (born February 2013) and C.W. (born June 2014), were interviewed in 2020. In the original proffer regarding this initial investigation, the State explained the two older girls did not make any disclosures of abuse against defendant at that time, but they later opened up about what had happened to them in 2020. Breitanyia advised Officer McCabe that E.W. was now "being very vocal" regarding defendant's conduct from that time as well.

¶ 15        The State proffered further Officer McCabe observed the CAC interview of E.W. conducted by Candi Buhl on October 17, 2023. Officer McCabe observed that E.W. told Buhl he

knew he was being interviewed to talk about defendant, his father's former friend. E.W. stated "his father is no longer friends with [defendant] because [defendant] had done something really bad" and "was really inappropriate with [them], in reference to him and his sisters." At first, during the interview, E.W. stated he "could not remember what [defendant] would do but stated when [defendant] was done, he would give him Smarties, which is a form of candy." After reviewing male and female anatomy with the aid of a diagram, E.W. was asked again about what defendant had done, and the State proffered Officer McCabe would explain:

> "E.W. stated: He was licking my penis. E.W. stated [defendant] would lick his penis every time he had been at [defendant's] residence. E.W. stated it would occur in [defendant's] house in the kitchen, stated he believes he was only three years old when this happened. He could only remember going there in the night with his father and his sisters."

E.W. described defendant lifting him onto the kitchen counter next to a blue bowl of Smarties, pulling his pants and underwear down, and licking his penis. E.W. said he would get Smarties every time defendant did this, and defendant told him not to tell his father. E.W. said this happened more than one time, and no one else witnessed it happening. E.W.'s sisters told him defendant "put his mouth on [their] vagina," but he did not see it happen. E.W. said F.W. told their father what had happened and defendant and their father got into a fight.

¶ 16　　　　Officer McCabe spoke with Breitanyia on October 26, 2023, and arranged for F.W. and C.W. to be interviewed by CAC on October 30, 2023. Officer McCabe observed F.W.'s forensic interview, conducted by Buhl. F.W. acknowledged she knew she was being interviewed because of the things her father's former friend did to her and her siblings. When asked what defendant had done to her, F.W. "went silent and did not respond." Later, she said

she could not remember what grade she was in when it happened but that it occurred at defendant's residence when they were visiting their father, who was living with defendant at the time. F.W. told Buhl "the incidents occurred inside the house in the kitchen two or three times" and she would be alone with defendant in the kitchen when it happened. F.W. said she could not remember what happened but knew it occurred during the summertime when she was in elementary school. Using a diagram, F.W. referred to the female genitalia as vagina and the male genitalia as "the no-no square." When asked where defendant had touched her, F.W. pointed to the vagina on the diagram. F.W. said she could not remember what defendant touched her with, but it happened two or three times. Defendant had pulled her pants down while she was standing in the kitchen. She did not know if defendant had his clothes on or not. She said it made her feel uncomfortable. F.W. said this was the second time she disclosed what defendant had done to her, and she denied telling her siblings or mother about it. She explained she was alone with defendant in the kitchen with "her family all being in the living room." F.W. had also seen defendant go into the kitchen alone with her siblings.

¶ 17     Officer McCabe observed the CAC interview of C.W. later that same day. C.W. stated her father had lived with defendant. Her father would be sleeping on the couch in the living room while she and her siblings watched television. Defendant "called each child into the kitchen one by one, starting with her sister, then her brother." After going into the kitchen, defendant would give them a "handful of Smarties" from a bag on top of the refrigerator. When her father asked where they got the candy, the children would tell him defendant gave it to them. C.W. stated this had only happened to her once, and she did not know now many times defendant took her siblings into the kitchen alone. When asked what defendant had done to her, C.W. "said at first she did not feel comfortable vocalizing what had happened." After reviewing the diagram

of male and female anatomy, C.W. was asked again what happened. C.W. said "defendant would put her onto the counter and then touch her as she pointed to the female vagina on the diagram." C.W. said defendant also touched her butt. C.W. said she thought the same thing happened to her siblings because they had all talked about it. When asked how defendant touched her, C.W. said she was on her hands and knees on the counter and defendant "licked inside of it [referring to her butt]" and she was "standing when he had licked her vagina." Defendant told C.W. not to tell anyone and would give her candy after touching her. C.W. said defendant had shown her his penis more than once by unzipping his pants, and she described him as "shaking it around." She denied that defendant touched her with his penis.

¶ 18    The State proffered Officer McCabe would testify that he conducted a phone interview with Glen W., the victims' father, on November 2, 2023. Glen told Officer McCabe that when he lived with defendant, he would sometimes sleep on the couch or go to bed early and leave defendant supervising the children. Williams saw Smarties candy in a purse belonging to one of his daughters. Williams confronted defendant about the allegations with Breitanyia present. Williams said defendant denied the allegations but then "remained silent and did not speak." Williams moved, and after leaving Canton, he had no further contact with defendant.

¶ 19    Officer McCabe conducted an Internet investigation of defendant on November 2, 2023. When viewing defendant's Facebook page, Officer McCabe saw "several images in his photographs that depicted [defendant] having sexually deviant behaviors, including statements in the images such as 'eat ass.' " On May 28, 2024, defendant met with Canton police but declined to speak with officers, so he was taken into custody.

¶ 20                             c. Testimony of Breitanyia L.

¶ 21    The State called Breitanyia to testify at the hearing. She stated Williams lived

with defendant in Canton for approximately three months in 2020. During that time, Breitanyia also lived in Canton, but she moved to her current apartment in Peoria in July 2020. She explained that she moved the children out of Canton after these incidents to "get a fresh start." Breitanyia believed defendant moved at that time to live with his mother in St. David, but in June 2021, he moved to Peoria. In March 2022, defendant was living at an address "two minutes or three minutes" from her home. Referring to a Google map printout, Breitanyia noted the driving distance between her home and defendant's home was half a mile, a trip estimated to take two minutes.

¶ 22        Breitanyia testified she has told other people about her children being victims of defendant, and "several" people responded that they had been victimized by defendant as well. Defendant's objection to this line of questioning was overruled, and the trial court concluded it was permissible evidence of defendant's social conduct. Breitanyia stated S.R. told her she was close to defendant when she was in seventh grade and "[t]hey lived right down the street from each other, and some inappropriate acts followed." Breitanyia stated B.H. told her that when she was 16 years old and defendant was 20 years old, defendant "was manipulating and trying to force himself on her and ultimately did force himself on her. And she felt coerced, manipulated, and violated at the end of that." Breitanyia stated when M.M. was 16 years old, she lived next door to Breitanyia and Glen (who were married at that time). M.M. would help Glen care for Breitanyia's children while she worked. Breitanyia said she "would come home, and [she] would observe [defendant] being extremely inappropriate with [M.M.]" Breitanyia stated she had to ask defendant to leave her home several times when M.M. was at her house. Breitanyia also stated, after this case was filed against defendant, M.M. "reached out to [her] and informed [her] that [defendant] had exposed himself to her not only in person but also in photographs, and he had

sent her several photographs of his genitals." Defendant would have been 26 or 27 years old at the time.

¶ 23 Breitanyia testified "[defendant] moved in 2022 to get closer to me." Breitanyia stated it "was absolutely terrifying" when she learned he was living so close to her and that "until he was detained, [her] children were no longer allowed to play outside." She explained it was "extremely terrifying" because they had both grown up in the same area and she had moved "to get away from this darkness, and [she] felt that [she] was being followed."

¶ 24 On cross-exanimation, Breitanyia confirmed from 2020 to 2024, defendant had not contacted her or come to her home.

¶ 25 2. *Defendant's Evidence*

¶ 26 Defendant testified that prior to being taken into custody, he lived in Peoria, but upon his release, he would reside in St. David with his mother. Defendant testified he would have no reason to visit Peoria and would stay out of Peoria if the trial court ordered him to do so. Defendant stated that prior to his arrest, he was not employed, but he was looking for a job. He testified that before that, he was a "stay-at-home father." He stated he would seek employment if released because he has four children to support "[f]inancially, physically, [and] emotionally." Defendant stated he was willing to abide by any conditions of release, including checking in with a probation officer, wearing an ankle monitor, submitting to a psychological examination, having no contact with the victims or other minors, and abiding by any restrictions on his movement.

¶ 27 On cross-examination, defendant testified that he has two daughters (ages 12 and 4) and two sons (ages 8 and 2). Defendant initially testified that all four children have different mothers and live separately. Defendant later clarified two of his children have the same mother. Defendant acknowledged he had no contact with three of his children (including his oldest

daughter, L.G.) since 2020 and did not know where they resided. Defendant testified his youngest son, whom he had been staying home to take care of, and his son's mother live at the Peoria address where he was also living before he was arrested. He acknowledged the mother of that child was in the courtroom.

¶ 28    3. *Argument of the Parties and the Trial Court's Ruling on the State's Motion*

¶ 29    The State argued the proof was evident and presumption great that defendant committed the offenses in this case, he presented a danger to the victims and the community, and there exists no condition or combination of conditions that could ensure the safety of the victims or community. At the time of his arrest, defendant resided near the victims. The State suggested it was not a "coincidence" that defendant decided to move to that location. The State argued, even if defendant intended to live in St. David upon his release, any conditions would be insufficient to ensure the safety of the children in that community. The State contended defendant is a predator who has had multiple alleged victims in multiple locations.

¶ 30    In response, defense counsel argued defendant intended to go to trial and prove his innocence. He argued the evidence relied upon by the State that defendant offended against other victims was uncorroborated hearsay and resulted in no other criminal charges against defendant. The allegations he offended against the three victims in this case stemmed from four years ago, and there were no allegations that anything has occurred since. Defendant stated he was willing to abide by any conditions imposed on him, including staying out of Peoria and away from the alleged victims or other minors.

¶ 31    In reply, the State acknowledged its argument that defendant intentionally moved near the victims was a "just a gut feeling that it's very troubling." The State also reminded the trial court of the 2017 complaint made by defendant's own child during a CAC interview of

similar inappropriate conduct. The State referred to Breitanyia's testimony regarding other purported victims, including witnessing defendant's inappropriate conduct against another minor, as evidence of "a pattern of [defendant] victimizing people in the community in general." Although there had been no new allegations since 2020, the State argued this did not mean nothing else had occurred.

¶ 32　　　　The trial court found the proof was evident and presumption great defendant committed the offenses alleged in the information and that he posed a threat. When addressing whether any condition or combination of conditions could mitigate the threat, the court noted the importance of additional evidence of the allegations of similar conduct made by defendant's child in 2017. The court found further corroboration and testimony "regarding statements made by, it would appear, other victims, means that the community is at risk." The court found defendant lacked credibility based on his hesitation in answering questions, particularly when he claimed that he would provide support for his children when, in fact, he admitted he did not know where three of the four children currently resided. The court explained, "[W]hat is of concern here is *** the victims of this case and the community at large, and I don't believe there is any set of circumstances at the present time that supports a release of [defendant] with what is in front of this Court." The court's findings were detailed in a written decision filed on November 13, 2024.

¶ 33　　　　　　　　　　B. Defendant's Motion for Relief

¶ 34　　　　On November 14, 2024, defendant filed a motion for relief pursuant to Rule 604(h)(2). Defendant argued the trial court erred in allowing hearsay evidence regarding his danger to the community, the court should not have considered evidence of a 2017 CAC interview of his child because those allegations did not result in any arrest or criminal charge

against him, the State failed to prove there existed no less restrictive means of protecting the community from the threat he may pose, and the court's decision to deny his pretrial release was against the manifest weight of the evidence. A hearing was held on the motion on November 26, 2024. The court denied the motion, reaffirming its original decision and finding there was no less restrictive means of protecting the community.

¶ 35        This appeal followed.

¶ 36                        II. ANALYSIS

¶ 37        Defendant did not file a memorandum in support of his appeal. Instead, he relies on his motion for relief filed in the trial court as his argument on appeal in accordance with Rule 604(h)(7). In his motion for relief, defendant raised the following issues: (1) the court erred in considering certain hearsay evidence regarding his dangerousness, including testimony regarding other alleged victims and testimony regarding the 2017 CAC interview of his child and (2) the court's decision to deny him pretrial release was against the manifest weight of the evidence because the State failed to prove there was no less restrictive means of protecting the community from any threat he may pose.

¶ 38        Under the Code, it is presumed that all criminal defendants are entitled to pretrial release on personal recognizance, subject to certain conditions. 725 ILCS 5/110-2(a) (West 2022). The State may petition for the pretrial detention of a defendant if the defendant is charged with a detainable offense as enumerated in the Code and, after a hearing, the trial court finds the defendant's release would pose "a real and present threat to the safety of any person or person or the community, based on the specific articulable facts of the case," or the defendant "has a high likelihood of willful flight to avoid prosecution." *Id.* § 110-6.1(a)(1), (8). The State has the burden to prove by clear and convincing evidence that any condition of pretrial release is

necessary. *Id.* § 110-2(b).

¶ 39     When live testimony is presented at a pretrial detention hearing, the trial court's underlying factual findings and ultimate decision regarding detention will not be disturbed unless they are contrary to the manifest weight of the evidence. *People v. Morgan*, 2025 IL 130626, ¶ 54. A decision is against the manifest weight of the evidence when "the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted). *Id.* ¶ 21.

¶ 40                              A. Hearsay Evidence

¶ 41     Defendant's first contention on appeal is that the trial court erred in considering certain hearsay evidence regarding his purported dangerousness to the community. Defendant did not support this contention with argument or citation to authority in his motion for relief in the trial court, which is the sole source of his argument on appeal. A reviewing court "is entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; any arguments inadequately presented are forfeited." *People v. Hui*, 2022 Ill App (2d) 190846, ¶ 52; see *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) (finding a defendant forfeits plain-error review when he fails to argue plain error on appeal). Forfeiture aside, we find no error occurred in the admission of this evidence at the detention hearing. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) ("[T]here can be no plain error if there is no error.").

¶ 42     A hearing on a petition to deny a defendant pretrial release is an evidentiary hearing at which the State has the burden of showing clear and convincing evidence of the applicable statutory requirements. *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 54. In determining dangerousness, the trial court will consider the factors enumerated in section 110-6.1(g) of the Code, which include, *inter alia*, evidence and testimony of a defendant's prior

- 13 -

criminal history, his "social history which tends to indicate a violent, abusive, or assaultive nature, or lack of such history," and any other factors "deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1(g)(2)(A), (2)(B), (9) (West 2022). Given the unique circumstances of pretrial detention hearings, the legislature has instructed that "[t]he rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." *Id.* § 110-6.1(f)(2), (5). This includes "specifically permitting acceptable evidence to include hearsay, and proffers based on reliable information." *Whitaker*, 2024 IL App (1st) 232009, ¶ 55.

¶ 43    In this case, it was not error for the trial court to consider Breitanyia's hearsay testimony regarding defendant's alleged abusive behavior toward other victims. This testimony was relevant as an indicator of defendant's social history and propensity or reputation for abusive behavior. Similarly, the court properly considered the proffered evidence regarding the 2017 CAC interview of L.G. wherein the State proffered Sheriff Webb would testify he observed the interview and L.G.'s assertions that defendant abused her in a manner similar to the alleged offenses in this case. This proffer was based upon reliable information from Sheriff Webb's own observations of L.G.'s forensic interview. This evidence also had a reasonable bearing upon defendant's propensity for committing abusive behavior against children. As such, no error occurred because the evidence was properly submitted and considered, in accordance with the Code, at defendant's detention hearing.

¶ 44                    B. Sufficiency of the Evidence

¶ 45    Defendant argues the trial court's decision to deny him pretrial release was against the manifest weight of the evidence because the State failed to prove there existed no less

restrictive means of protecting the community from the threat he may pose. We disagree.

¶ 46 Defendant does not challenge the trial court's conclusion that he was charged with a detainable offense and posed a threat to the safety of any person or the community. Instead, defendant challenges the court's determination there were no "less restrictive means besides detention" to protect the alleged victims or the community from his threat. A finding of dangerousness alone does not automatically warrant pretrial detention. *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 (finding pretrial detention requires more than a detainable offense and a threat to public safety). "Instead, the trial court must determine, based on the specific facts of the case and the defendant's individual background and characteristics, whether any combination of conditions can mitigate the threat and allow the defendant's release." *Id.* "In each case, a court must conduct an 'individualized' assessment of the propriety of detaining the defendant versus releasing him or her with conditions." *Id.* ¶ 15.

¶ 47 We determine the trial court's decision that there existed no condition or combination of conditions that would mitigate the threat defendant posed to any individual or the community was not against the manifest weight of the evidence. The record reveals defendant had demonstrated a pattern of sexually abusive behavior. Breitanyia testified three other individuals had informed her they were victimized by defendant. Breitanyia witnessed defendant's abusive conduct toward one of those victims firsthand. In 2017, defendant's own daughter, L.G., accused him of sexually abusing her in a manner similar to that alleged by the victims in this case. It is notable that defendant has no contact with that daughter or two of his other children, to the point of testifying he does not even know where they reside. It is troubling, to say the least, given L.G.'s allegations and those made by the victims in this case, that defendant identified himself as a stay-at-home father for his youngest child.

¶ 48 Furthermore, we agree with the trial court's assessment that defendant's testimony lacked credibility. Defendant testified he had four children whom he would be supporting "financially, physically, [and] emotionally" if he were released, but he later acknowledged he had not been in contact with three of those children since 2020 and, it bears repeating, he did not even know where they currently live. Further concern regarding defendant's credibility was revealed as the court doubted whether it was, in fact, a coincidence that he moved to live in such close proximity to the alleged victims in this case. Breitanyia testified she believed defendant moved to that location to get closer to her, and she was terrified because she moved to Peoria "to get away from this darkness" and felt as though defendant was following her. Defendant's past behavior and credibility issues call into question his stated intentions to move to St. David and stay away from Peoria. This is particularly true given defendant testified his youngest child and that child's mother still reside a mere half mile from the victims' residence in Peoria.

¶ 49 After a careful review of the record, we conclude the State proved an absence of any less restrictive means of protecting the victims and the community from the threat posed by defendant. The trial court's decision to deny defendant pretrial release was not against the manifest weight of the evidence. Therefore, we affirm.

¶ 50 III. CONCLUSION

¶ 51 For the reasons stated, we affirm the trial court's judgment.

¶ 52 Affirmed.